SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. PHILIP CHISM

 
 Docket:
 SJC-13161
 
 
 Dates:
 October 9, 2024 - February 25, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Essex
 

 
 Keywords:
 Homicide. Rape. Robbery. Evidence, Expert opinion, Scientific test, Hearsay, Relevancy and materiality, Cross-examination, Redirect examination, Disclosure of evidence, Age, Inference, Argument by prosecutor, Photograph. Witness, Expert, Psychiatric examination, Cross-examination, Redirect examination. Criminal Responsibility. Practice, Criminal, Hearsay, Cross-examination by prosecutor, Psychiatric examination, Disclosure of evidence, Discovery, Instructions to jury, Motion to suppress, Argument by prosecutor, Venue, Sentence, Capital case. Jury and Jurors. Constitutional Law, Search and seizure, Sentence. Search and Seizure, Inevitable discovery. Rules of Criminal Procedure.
 
 

       Indictments found and returned in the
Superior Court Department on November 21, 2013, and January 24, 2014.
      A pretrial motion to suppress evidence and
a motion for a change of venue were heard by David A. Lowy, J., and the cases
were tried before him.
      Michael R. Schneider (Benjamin Brooks also
present) for the defendant.
      David F. O'Sullivan, Assistant District
Attorney, for the Commonwealth.
      Melissa Allen Celli & Ryan M. Schiff,
for youth advocacy division of the Committee for Public Counsel Services,
amicus curiae, submitted a brief.
      Sara E. Silva & Chauncey B. Wood, for
Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted
a brief.
      GAZIANO, J.  In the early morning hours of October 23,
2013, a search team found Colleen Ritzer, a Danvers High School math teacher,
dead in the woods outside the high school. 
She had been brutally raped, strangled, and stabbed.  The defendant was a fourteen year old student
in her freshman math class.  A Superior
Court jury convicted the defendant of murder in the first degree on theories of
deliberate premeditation and extreme atrocity or cruelty and, as a youthful
offender, on indictments charging aggravated rape and armed robbery.  
      The major issue before the jury was
whether the defendant lacked criminal responsibility.  On appeal, the defendant contends that the
trial judge impeded his ability to present fully this defense.  He raises the following issues:  first, whether the judge properly excluded
expert testimony of structural magnetic resonance imaging (sMRI) brain scans
showing abnormalities in the defendant's brain consistent with mental illness;
second, whether the judge erred in prohibiting the defendant's expert
psychiatrist from testifying on direct examination to hearsay statements made
by the defendant; third, whether the prosecutor unfairly cross-examined defense
expert witnesses on irrelevant and prejudicial topics; fourth, whether the
judge erred in requiring the disclosure to the Commonwealth of psychological
testing data generated by a nontestifying defense expert; and, fifth, whether
the Commonwealth's expert psychologist should have been precluded from
testifying after reviewing the defendant's suppressed videotaped confession.  
      In addition, the defendant asserts that he
is entitled to a new trial based on several other erroneous rulings, and that
the Commonwealth failed to introduce sufficient evidence to support the
aggravated rape and armed robbery convictions. 
Finally, he contends that imposition of a forty-year sentence on the
nonhomicide convictions violated the proportionality requirements of art. 26 of
the Massachusetts Declaration of Rights. 
For the reasons detailed below, we affirm the convictions and, after a
complete review of the record, decline to exercise our authority under
G. L. c. 278, § 33E, to order a new trial or reduce the verdict
of murder in the first degree.[1]  
      1. 
Facts.  We recite the facts the
jury could have found, reserving other facts for our discussion of specific
issues. 
      a. 
The Commonwealth's case.  The
twenty-four year old victim began teaching math at Danvers High School (high
school) in September 2012.  This was a
dream job for the self-described math enthusiast, who wanted to teach from an
early age.  She lived with her parents
and younger siblings in a neighboring town. 

      In October 2013, the defendant was a
student in the victim's freshman class. 
He recently had moved to Danvers from Tennessee with his mother.  By that point in the school year, he had a
few friends and was a skilled member of the junior varsity soccer team.  The defendant was an average student with
inconsistent effort typical of many first-year students.  
      On October 22, 2013, the victim taught the
defendant's math class in the last period of the school day, from 1 P.M. to
1:55 P.M.  Her classroom was located on
the second floor of the high school's three-story academic wing.  The defendant entered the victim's classroom
dressed in a red sweatshirt with a black and yellow backpack on his back and
carried a red nylon drawstring backpack. 
Wearing an earbud in one ear and doodling in a notebook, the defendant
appeared uninterested in the lesson and did not participate in a group
activity.  
      The defendant remained in the victim's
classroom after the last bell.  While
teachers were available to offer extra help to students until 2:30 P.M., the
victim confided to a coworker, "I don't know why he is here."[2]  Another student stayed after school to visit
the victim and draw on the whiteboard. 
In the extra help session, the victim asked the defendant about his
family, his recent move, and what he missed about Tennessee.  The defendant appeared annoyed and answered
the victim's friendly questions in a low, "mumbly" tone of
voice.  
      When the victim stepped out of the room to
make copies and talk to her coworker, the defendant joined his classmate at the
whiteboard.  The defendant complimented
her artwork.  He wrote her name in
Chinese characters, and she acknowledged that it was "cool."  During this interaction, which lasted from
fifteen to twenty minutes, the defendant maintained eye contact with his
classmate and had no apparent difficulties communicating with her.  The victim stepped back into her classroom to
inform the students that she had to leave soon. 
On her way out, the defendant's classmate told the victim that she was a
"great person . . . really nice . . . [and made] math really easy,"
and expressed disappointment that she did not have math class with the victim
the next day.  Observing this
conversation, the defendant looked "annoyed" and "angry
almost."  The victim and the other
student left the classroom at the same time, while the defendant lingered
behind.  
      At 2:55 P.M., the victim entered a
second-floor girl's bathroom.[3]  Seconds
later, the defendant, now wearing a light blue hooded sweatshirt, emerged from
the victim's classroom.  Armed with a box
cutter knife, he put on a pair of white gloves and followed the victim into the
bathroom. 
      Approximately eleven minutes later, a
student briefly walked into the bathroom. 
Upon opening the door, she observed the naked buttocks of a dark-skinned
person near the bathroom sinks.[4] 
Believing that she had interrupted someone changing clothes, the student
hurriedly left the bathroom to avoid embarrassing a classmate.  
      The defendant exited the bathroom at 3:07
P.M. -- twelve minutes after entering. 
He walked briskly with his sweatshirt's hood up and his head down,
carrying a bundle of clothing, which included the victim's black pants.  The defendant was gloveless, and there was a
visible bloodstain on his right hand.  He
then walked down a stairway and exited the school.  
      Once outside, the defendant entered a
wooded area alongside the student drop off area.  A parent, whose car was parked on the curb,
observed the defendant change clothes while crouched in the bushes.  The defendant reentered the school at 3:10
P.M., wearing a white T-shirt and jeans, and was no longer carrying the bundle
of clothes he had removed from the bathroom. 
Inside the building, the defendant ducked into the victim's second-floor
classroom and exited with his red sweatshirt draped over his arm, carrying his
black and yellow backpack, along with the victim's black tote bag and purple
lunch bag.  He jogged toward the
bathroom, but paused, interrupted by a soccer teammate.  
      The teammate had expected to meet the
defendant on the soccer field at 3 P.M. for an informal practice session.  When the defendant did not arrive, the
teammate went inside the school looking for him.  Observing the defendant on the second floor,
the teammate yelled the defendant's nickname. 
The defendant did not answer.  The
teammate walked up to the defendant and asked him what he was doing.  The defendant explained that "he had
lost something and he couldn't find it." 
He declined the teammate's offer of help and promised to meet him on the
soccer field.  The defendant was sweating
and appeared to be scared.  
      The teammate followed the defendant
downstairs to the first floor, where he observed the defendant move a large
blue rolling recycling bin from the stairway to the elevator bank.  The teammate asked the defendant what he was
doing with the bin.  The defendant
answered, "nothing," and again told the teammate he would meet him on
the soccer field.  At the elevator bank,
the defendant looked afraid, worried, and "[n]ot himself."  The teammate left.  
      The defendant took the elevator to the
second floor and rolled the bin into the bathroom at 3:16 P.M.  He emerged seven minutes later with the
bin.  The defendant left the building
pulling the bin (which seemed heavier than before) through a parking lot.  A student, seated at a picnic table, observed
the defendant struggle to push the bin up a steep, rocky incline into the woods
behind the school.  
      At 4 P.M., the defendant returned to the
school, barefoot and still wearing a white T-shirt and bloodstained jeans.  He collected items from his third-floor locker
and entered a boy's bathroom to change into a black long-sleeved shirt, black
shorts, and blue sneakers.  After briefly
visiting the second-floor girl's bathroom, he went back into the woods at 4:07
P.M., and about fifteen minutes later, walked through a school parking
lot.  
      The defendant unexpectedly encountered a
friend outside the school, whom he had met at summertime religious
services.  Appearing "a little bit
just down in the dumps" at first, the defendant returned to "his
normal self" as they discussed an upcoming Sunday night church youth group
meeting.  The defendant said that he
could not attend because of mounting homework and apologized for not returning
text messages.  After this conversation,
the defendant walked through the field house and left the high school at 4:31
P.M.  
      Next, the defendant walked about two or
three miles to a Danvers shopping center. 
There, he used the victim's credit card to purchase fast food and a
movie ticket.  At around 5:30 P.M., the
defendant shoplifted a survival knife from a store and walked into the
bordering town of Topsfield.  
      At 6:30 P.M., the defendant's mother
reported him missing to the Danvers police department.  Efforts to locate the defendant ensued,
including posts to social media sites and a reverse 911 call to Danvers
residents.  Neal Hovey, a Topsfield
police officer who lived in Danvers, learned of the defendant's disappearance
prior to reporting to work.  On duty in
Topsfield, at 12:28 A.M., Officer Hovey responded to a dispatch concerning a
Black man walking along Route 1 northbound. 
This section of highway was unsafe for pedestrians, especially at
night.  Hovey found the defendant walking
on the side of the road wearing a light blue hooded sweatshirt and black shorts
and carrying a red nylon drawstring backpack. 
In response to Hovey's questions, the defendant answered that he was
going "nowhere," had come from "Tennessee," and had no
address.  Hovey, joined by fellow
Topsfield police officer Joseph DeBernardo, pat frisked the defendant.  The officers found two Massachusetts drivers'
licenses, credit cards, and an insurance card, all in the victim's name -- the
significance of which they did not realize at the time.  
      The defendant eventually informed the
officers that his name was Philip Chism. 
The police officers were "elated" to have found the missing
teenager.  Hovey went into "parent
mode" placing the defendant inside a cruiser for warmth.  Before being driven to the police station,
the defendant explained that he stole the credit cards from a woman's
automobile parked at a grocery store.  At
the police station, Hovey inventoried the red backpack.  Although the defendant indicated that the
backpack contained "survival gear," Hovey found, among other items,
the victim's wallet and underwear within the backpack.  Inside the wallet, Hovey located a
rectangular box cutter with an exposed one-inch blade stained with a
"reddish-brownish colored substance." 
Hovey asked, "[W]hose blood is this?"  The defendant replied, "[I]t's the
girl's."  Asked where she was, he
further replied, "[B]uried in the woods."  He also answered that it was too late to save
her.  
      In the meantime, the victim's parents were
concerned when she did not arrive home from work.  Alerted by the victim's parents, her friends
and colleagues searched the school building and grounds.  They found her vehicle parked in its usual
space and her purse sandwiched between two boulders in a wooded area along a
dirt path.  An expanded search team,
consisting of State and local law enforcement agencies, discovered numerous
pieces of evidence in the woods, including the bloodstained white gloves, the
victim's pants, the recycling bin toppled over on its side, the defendant's
school identification, and a folded note reading, "I hate you
all."  At 3 A.M., a crime scene
technician walking down a dirt path through a field near the high school's
parking lot observed a human toe with pink nail polish protruding from some
leaves by the path.  
      The victim was positioned on her back
covered with leaves and sticks.  She was
unclothed from the waist down, with her legs spread and bent.  Her shirt was pushed up, and bra pulled down,
exposing her breasts.  A tree branch had
been inserted into her vagina, causing a one-inch perimortem laceration.[5]  An autopsy revealed petechial hemorrhaging
around her face, eyes, and mouth indicative of asphyxiation.  She suffered at least sixteen sharp force
injuries to her neck that severed major blood vessels, some inflicted with enough
force to penetrate her vertebrae.  
      Forensic scientists recovered two sperm
cells from an internal vaginal swab.  A
Y-chromosome short tandem repeat deoxyribonucleic acid (DNA) test of these
cells generated a partial match to the defendant's DNA profile.  The frequency of occurrence of the DNA
profile generated from the vaginal swab was one in 521 of the African-American
population; one in 1,114 of the Asian population; one in 167 of the Caucasian
population; and one in 455 of the Hispanic population.  
      b. 
The defendant's case.  The
defendant asserted a defense of lack of criminal responsibility.  In support, he called several witnesses, including
family members, a soccer coach, friends, high school classmates, and three
experts.  
      According to family members and
corroborated by psychiatric records, the defendant's maternal grandmother had
suffered a "nervous breakdown" and was hospitalized for
"psychiatric problems."  Likewise,
the defendant's aunt had been diagnosed with mental illness requiring
psychiatric hospitalization.  
      Relatives and family friends described the
struggles of the defendant's mother in raising the defendant and his two
siblings as a single parent.  The family
moved from Tennessee to Florida and back to Tennessee.  She attempted to provide the defendant with a
structured environment in a sometimes chaotic household.  The defendant, in his preteen years, was
moody and reserved, but still respectful and well behaved.  A Tennessee middle school soccer coach singled
the defendant out as a hardworking, respectful, and unselfish teammate.  He described the defendant as a "yes,
sir, no, sir" type of player.  
      In Clarksville, Tennessee, the defendant
developed a close brotherly bond with a friend. 
"[C]raving normal[cy]," the defendant spent most weekends with
his friend's family.  The two would
skateboard and play videogames and sports together.  Additionally, around this time, the defendant
developed an obsession with anime[6] television shows and books.  The defendant, according to his friend's
mother, was "polite" and "well-behaved."  The only exception, she noted, was the
defendant's disrespectful attitude toward his mother.  Wishing to be near family in Massachusetts,
the defendant's mother moved to Danvers in 2013, leaving her other children in
the care of relatives.  Although the
defendant displayed no outward signs of anxiety, the move away from his best
friend, his best friend's family, and other sources of support in Clarksville
was, according to defense experts, disruptive. 

      The defendant's high school classmates
noticed behavioral changes in the days or week preceding the crime.  The defendant ignored other students, seemed
preoccupied, and became withdrawn, solitary, and quiet.  A soccer teammate recounted that, around the
middle of October, the defendant had scored a goal and uncharacteristically did
not celebrate the accomplishment.  When
the coach suggested that the defendant praise his teammate for the assist, the
defendant "just turned away and didn't really say anything," with a
blank expression on his face. 
      Three criminal responsibility expert
witnesses testified for the defense: 
Drs. Anthony Jackson, Richard G. Dudley, Jr., and Yael Dvir.  The first witness, Dr. Jackson, was the
medical director for the adolescent continuing care units at the Worcester
Recovery Center and Hospital.  Relying on
near-daily midtrial observations of the defendant, he concluded that the
defendant suffered from major depression and a "brief transient psychotic
episode."  The psychotic episode, he
opined, involved disorganized behavior, language, and thoughts, impacting the
defendant's ability to function.  Jackson
noted that the defendant showed marked improvement when administered Risperdal,
a powerful antipsychotic drug.  He did,
however, acknowledge on cross-examination that the stress of the trial may have
triggered this psychotic event.  
      Dr. Dudley, a psychiatrist, was the
defendant's main expert witness.  He
interviewed the defendant seven times from March 2015 to December 2015.  In these sessions, which lasted from two to
three hours, Dudley noted that the defendant had a flat affect, mumbled to
himself, failed to respond to questions or pay attention, and exhibited
disorganized thoughts and auditory hallucinations.  Dudley also reviewed the high school's
videotape footage, police reports, and the defendant's family history of mental
illness, and conducted collateral interviews with the defendant's family
members and classmates.  Based on this
information, he diagnosed the defendant as suffering from a psychotic disorder
not otherwise specified, as defined in the Diagnostic and Statistical Manual of
Mental Disorders (4th ed. 1994) (DSM-IV) issued by the American Psychiatric
Association (APA).  This diagnosis is
used when a person has enough symptoms to meet the broad category of psychotic
disorders but there is insufficient information to diagnose a more specific
disorder.  Dudley was unsure whether the
disorder would go on to "look like" "schizophrenia early
onset" or more like "trauma-induced psychosis."  He therefore preferred the DSM-IV diagnosis,
rather than the APA's comparable Diagnostic and Statistical Manual of Mental
Disorders (5th ed. 2013) (DSM-V) diagnosis of unspecified schizophrenia
spectrum and other psychotic disorders.  
      Dudley opined to a reasonable degree of
medical certainty that, at the time of the incident, the defendant was
suffering from a psychotic disorder, acted in response to command
hallucinations, and was in the throes of a psychotic episode.  As a result of this mental disease or defect,
the defendant lacked the substantial capacity to conform his conduct to the
requirements of the law.  Dudley
explained that the defendant experienced intense and "impossible . . . to
ignore" command auditory hallucinations that made the defendant feel
"humiliated [and] degraded," "upset and angry," and
"depressed and withdrawn." 
Dudley also testified that the defendant had a delusional belief that he
"wasn't a human being," but rather a "kind of nonhuman with
nonhuman powers."  
      Dudley explained that the defendant's
conduct, as displayed on the videotaped footage, demonstrated disorganized
thinking characteristic of an individual experiencing a psychotic episode.  For example, the defendant "walk[ed]
around the halls of the high school covered with blood," in view of
surveillance cameras, rather than fleeing as soon as possible.  The defendant's posing of the body and penetration
of the victim's vagina with a tree branch, Dudley opined, was
"bizarre" behavior consistent with this diagnosis.  
      Dr. Dvir, a psychiatrist, testified as a
teaching expert witness on the topic of psychosis in children and
adolescents.  As such, she never had met
the defendant and offered no opinion on his criminal responsibility.  She informed the jury that schizophrenia is a
biologically based "chronic brain illness" characterized by periods
of acute psychosis, and that the usual age of onset is later in adolescence,
toward the mid-twenties and thirties, but early onset occurs between the ages
of thirteen and eighteen.  She opined
that adolescents who suffer from schizophrenia but have a higher intellectual
ability can better function between psychotic episodes as compared to
"somebody who starts already having some deficits."  Dvir opined further that an adolescent can
experience "quiet" hallucinations and delusions as "[l]ead-up
symptoms" that can be easily missed by adults for a long time, before a
significant life transition acts as a stressor that "push[es] [the
adolescent] over the edge."  
      c. 
The Commonwealth's rebuttal. 
Three expert witnesses testified in rebuttal:  Drs. Kelly Casey, Nancy Hebben, and Robert
Kinscherff.  A month before trial, Dr.
Casey, a forensic psychologist, administered a Rorschach inkblot test, a
"performance-based measure of personality and emotional
functioning."  The defendant,
according to Casey, did not exhibit disorganized thoughts, psychosis, or delusions.  She testified that although the defendant had
a "fantasy life" and his "reality testing" was
"impaired," he understood the difference between fantasy and reality,
and "didn't show any signs of getting lost in a fantasy world."  
      Dr. Hebben, a neuropsychologist hired by
Dr. Kinscherff, conducted a neuropsychological evaluation of the defendant for
cognitive defects and malingering. 
Malingering, she explained, ranges from "pure malingering"
(i.e., feigned mental illness) to "partial malingering" (in which the
individual exaggerates symptoms of actual mental illness).  Hebben opined that, overall, the defendant's
test results were "highly suggestive of a malingered mental
illness."  She was, however, unable
to rule out the possibility that the defendant suffered from "some kind of
psychopathology" but just exaggerated his symptoms.  
      Kinscherff, a forensic psychologist,
interviewed the defendant for a total of about thirteen hours between July 2015
and October 2015.  It was his opinion
that the defendant was "not suffering from a mental disease or
defect" on October 22, 2013, and that the defendant may have exhibited
symptoms of distress or emotional disturbance, but they did not substantially
impair his ability to conform his conduct to the requirements of the law.  Significant to his opinion were Casey's test
results showing no indication of a psychotic process, and Hebben's results
showing likely malingering and no evidence of a psychotic disorder.  In contrast to Dudley's testimony, he did not
observe the defendant exhibit disorganized thoughts or an impaired ability to
communicate.  
      The prosecutor, in detail, walked
Kinscherff through videotaped surveillance footage, and Kinscherff pointed out
evidence of the defendant's planning (such as bringing gloves and a box cutter)
and efforts to avoid detection. 
Kinscherff testified that the amount of "overkill," the taking
of the victim's underwear as a souvenir, and the degrading way the defendant
posed her body were evidence of "emotional arousal" and the
defendant's effort to assert dominance and control over the victim.  These are features of "sexual
homicides" not involving mental illness. 

      2. 
Discussion.  In this direct
appeal, the defendant presents eleven claims and also asks this court to vacate
his conviction of murder in the first degree under G. L. c. 278,
§ 33E.  He contends that (1) the
judge abused his discretion in excluding expert testimony that abnormalities in
the defendant's sMRI brain scans were consistent with mental illness; (2) the
judge improperly precluded Dudley from testifying on direct examination to
hearsay statements made by the defendant; (3) the Commonwealth improperly
cross-examined defense experts on irrelevant and prejudicial topics; (4) the
judge erred in forcing the defense to disclose raw psychological testing data
generated by a nontestifying expert witness to the Commonwealth as reciprocal
discovery; (5) Kinscherff should have been precluded from testifying after
reviewing the defendant's suppressed videotaped confession; (6) the judge erred
in failing to provide the jury with the defendant's requested instruction on
adolescent brain development; (7) the Commonwealth did not introduce sufficient
evidence to establish that the defendant raped and robbed the victim prior to
her death; (8) the judge improperly applied the doctrine of inevitable
discovery in denying a motion to suppress items seized from the defendant in
Topsfield; (9) the prosecutor's remarks and actions exceeded the bounds of
proper closing argument; (10) the judge abused his discretion in denying a
motion for a change of venue due to pretrial publicity; and (11) the imposition
of a forty year sentence on the aggravated rape and armed robbery charges was
violative of proportionality requirements guaranteed by art. 26.  We discuss each issue in turn.  
      a. 
The exclusion of the defendant's sMRI brain scan evidence.  i.  The
expert disclosures and the evidentiary hearing. 
On July 13, 2015, a few months before trial, the defense noticed its
intent to offer Dudley's expert testimony concerning the defendant's mental
state at the time of the alleged offense. 
On October 8, the second day of trial, the defense provided the
Commonwealth with a report authored by Ruben Gur, Ph.D., the director of the
Brain Behavior Laboratory and the Center for Neuroimaging in Psychiatry at the
University of Pennsylvania's Perelman School of Medicine.  Defense counsel retained Gur to conduct a
"neurobehavioral assessment" of the defendant by volumetric analysis
of sMRI brain scans.  The results of the
defendant's brain scans were compared with those of 190 healthy adults.  In sum, Gur concluded, "Magnetic
resonance imaging results of [the defendant's] brain show volume abnormalities
indicating brain damage.  The location
and high degree of asymmetry of volumetric values is consistent with traumatic
brain injury.  These abnormalities are in
regions that are very important for regulating emotions and
behavior."  He also opined that
"[t]he etiology of the abnormalities needs to be established by clinical
correlation but they are consistent with major psychiatric disorders such as
schizophrenia or traumatic brain injury." 

      The defendant's brain scans, which were
performed at a Boston hospital in September 2015 (two years after the crimes),
were "examined quantitatively" by Dr. Theodore Satterthwaite.  On October 21, the defense added
Satterthwaite to its witness list and provided notice of the subject matter of
his expert opinion.  
      On November 18, 2015, Gur issued an
addendum report comparing the defendant's brain scans to a cohort of fifteen
through seventeen year olds.  Gur
explained that "since [the defendant] is still an adolescent, analysis was
performed to make a more valid comparison between [the defendant] and
[sixty-one] healthy adolescents." 
The results of this comparison were consistent with the prior
examination, with "abnormalities in more regions" of the brain.  Regarding the etiology of the abnormalities,
Gur restated that while clinical correlation is required, "they are consistent
with major psychiatric disorders such as schizophrenia, or traumatic brain
injury, or a combination."
      The Commonwealth, on November 30, filed a
motion to exclude the testimony of Gur and Satterthwaite as failing to meet
Daubert-Lanigan reliability standards, or, in the alternative, as being unduly
prejudicial.  See Daubert v. Merrell Dow
Pharms., Inc., 509 U.S. 579, 585-595 (1993); Commonwealth v. Lanigan, 419 Mass.
15, 24-26 (1994); Mass. G. Evid. § 403 (2024).  The defense, in turn, moved for a
Daubert-Lanigan hearing to admit Gur and Satterthwaite's testimony that the
sMRI brain scans showed volumetric reductions in regions of the brain
consistent with schizophrenia, and that these abnormities were "likely
present at age fourteen."  
      On December 3, the judge conducted a voir
dire hearing at which Gur and Satterthwaite testified.  Gur described the methods utilized to measure
the volume of the defendant's brain structures with sMRI technology.  He testified that sMRI brain scans are commonly
used in research to link brain volume to behavior and "[are] in widespread
use to detect various conditions." 
The values for the defendant's brain scans were then compared to
sixty-one healthy adolescents.  Gur
opined that the defendant's brain, as compared to the control group, showed
volumetric abnormalities in particular regions of the brain consistent with
schizophrenia.  The correlation between
volumetric abnormalities in certain regions in the brain and schizophrenia,
according to Gur, is generally accepted in the scientific community as
referenced in the DSM-V.[7] 
      On cross-examination, Gur stated that he
was unaware whether the adolescents in the control group were followed and
reevaluated to determine whether any participants were later diagnosed with
mental illness.  He conceded that
schizophrenia is diagnosed by behavior, not through "radiological[,]
laboratory[,] or psychometric test[ing]." 
Gur explained:  "[I]f you do
have [magnetic resonance imaging], then that will help you confirm your
diagnosis.  But right now the diagnosis
is based entirely on behaviors, which is really what will be changing as we
speak."  
      Next, Satterthwaite testified to the
common use of volumetric analysis as a research tool to study brain development,
normal brain aging, and "neuropsychiatric disorders such as schizophrenia
and bipolar disorder."  It is not
used, however, in clinical practice.  He
agreed with Gur's assessment that the pattern of volume loss in particular
regions of the defendant's brain was "globally consistent with what we
often see in schizophrenia."  Unlike
Gur, Satterthwaite did not testify that the sMRI scans could be used to confirm
a diagnosis.  He also stated that the
brain undergoes "a lot of volumetric changes" throughout the
developmental process.  
      The sample size of sixty-one adolescents,
Satterthwaite noted, was "actually quite large" as compared to those
typically used in research studies and sufficient to compare the defendant's
brain to the "normal range" of the control group.  At the same time, he expressed a concern that
"the number of scans here limits our statistical power to detect
abnormality."  It was possible to
combine databases, but that was not done here. 

      Following the hearing, the defendant proffered
the testimony of Satterthwaite, not Gur. 
Defense counsel further clarified that she did not intend to use chalks
or introduce "fancy pictures" (referring to three-dimensional brain
scan images reproduced in Gur's report).  

      ii. 
The ruling.  At the close of the
voir dire hearing, the judge dictated his findings and rulings into the record,
announcing that he would not permit Satterthwaite to testify as an expert
witness.  He first reasoned that
"the MRI of the defendant's brain in 2015 [was] of extremely limited
probative value as it relate[d] to the defendant's mental state in October of
2013."  Second, he explained that
Satterthwaite's testimony did not satisfy gatekeeper reliability, where members
of the control group were not the same age as the defendant at the time of the
incident, and where they were not followed and reevaluated "to see whether
they ever developed brain disorders." 
Third, "[t]he inference the jury would be asked to draw would be
that since the volumetric values of the defendant's brain are consistent with
somebody with schizophrenia, . . . the defendant has
schizophrenia," which was an impermissible inference because that
diagnosis is "based on behavioral observations."  
      The judge also excluded the expert testimony
on the ground that the limited probative value of the defendant's mental state
in 2015, as demonstrated through sMRI brain scans, was substantially outweighed
by the danger of unfair prejudice.  See
Mass. G. Evid. § 403. 
      iii. 
Renewed motion to admit brain scan evidence.  When the trial resumed, the prosecutor raised
the possibility of the defendant's malingering in her cross-examination of
Dudley.  Dudley admitted that he relied
on the defendant's self-reported symptoms and did not order psychological
testing.  Psychological testing, he later
explained, was inappropriate for an adolescent suffering from psychotic or
trauma-related symptoms.  Dudley further
answered that he did order a different type of testing (implicitly referring to
the sMRI brain scans).  This line of
inquiry, the defendant contended, opened the door to admission of the sMRI
brain scan test results. 
      The judge allowed the defense to ask
Dudley whether he, in fact, requested brain scan testing and considered the
results in forming his opinion. 
"What the testing [was]," the judge ruled, "is not
pertinent."  Dudley then
testified:  "I requested a form of
testing where there are scans of the brain to look for whether there are actual
changes in the brain that are consistent with the diagnosis of a psychotic
disorder."  The test results, which
he received after writing his report, were considered by Dudley in forming his
opinion that the defendant suffered from mental illness at the time of the
incident.  Dudley, however, was not
permitted to answer whether the brain scans were consistent with his opinion
that the defendant suffered from a psychotic disorder.  In addition, the judge sustained objections
to questions posed to the teaching expert Dvir concerning volumetric differences
in the brains of juveniles and adults diagnosed with schizophrenia and whether
there are "physical manifestations of schizophrenia in the brain." 
      After the Commonwealth's rebuttal
evidence, the defendant moved to admit the testimony of Gur or Satterthwaite
"to rebut the neuro-psych and psychological testimony that [the defendant]
[was] malingering."  The brain
scans, the defendant pointed out, were taken roughly at the same time as
Hebben's testing, and "provide strong evidence" that the defendant
suffered from schizophrenia.  He argued
that "this would be evidence that [the defendant], in fact, had
legitimate, severe mental health symptoms," admissible to challenge the
Commonwealth's allegations of feigned mental illness.  The judge denied the motion on the grounds
that he did not credit Gur and Satterthwaite's testimony, which "[did] not
come close to satisfying the Frye general acceptance, or the Daubert-Lanigan
factors."
      Addressing Gur's testimony, the judge
stated:  "Dr. Gur couldn't answer
one question directly[,] [w]ent off on tangents, and his overall demeanor left
me in the position that I have to take under [Mass. G. Evid. § 104(a)],
determining preliminary questions of fact, that he –- I believe that what he
was an advocate for his area of interest and . . . an advocate for
his university. . . .  So the
problem with Dr. Gur is I don't believe him. 
I just don't believe him."  
      Satterthwaite's testimony, the judge
concluded, failed to satisfy gatekeeper reliability for the following
reasons.  First, there was no evidence
that the volumetric abnormalities bore on the question whether the defendant
was malingering, and the uncontroverted testimony was that someone may both
suffer from a mental illness and malinger. 
Second, the judge reiterated his previously stated reasons from the
individual voir dire hearing as to why the proffered expert testimony failed
gatekeeper reliability, while emphasizing that "the DSM‑[V] specifically
cautions that diagnosis of schizophrenia cannot be made on the basis of
laboratory testing."  In addition,
the judge once again determined that the probative value of the proffered
expert testimony was substantially outweighed by the risk of unfair prejudice.  See Mass. G. Evid. § 403.  
      iv. 
Standard of review.  "The
decision to exclude expert testimony rests in the broad discretion of the judge
and will not be disturbed unless the exercise of that discretion constitutes an
abuse of discretion or other error of law."  Commonwealth v. Ridley, 491 Mass. 321, 326
(2023), quoting Commonwealth v. Fernandes, 487 Mass. 770, 778 (2021), cert.
denied, 142 S. Ct. 831 (2022).  See
Canavan's Case, 432 Mass. 304, 310-311 (2000). 
A judge abuses his or her discretion if "the judge made a clear
error of judgment in weighing the factors relevant to the decision, such that
the decision falls outside the range of reasonable alternatives"
(quotation and citation omitted).  L.L.
v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  
      In addition to the judge's gatekeeper role
under Daubert-Lanigan, a judge assessing the admissibility of expert testimony
also has a "general duty to exclude evidence that is irrelevant or for
which the probative value is substantially outweighed by the risk of unfair
prejudice, confusion, or waste of time." 
Commonwealth v. Hoose, 467 Mass. 395, 417 (2013).  See Commonwealth v. Bonds, 445 Mass. 821, 831
(2006) ("we rely on a trial judge to exercise discretion in admitting only
relevant evidence whose probative value is not substantially outweighed by its
prejudicial or cumulative nature"); Commonwealth v. Patterson, 445 Mass.
626, 639 n.10 (2005) (expert testimony must be relevant as well as satisfy
gatekeeper reliability).  "We review
a judge's decision whether the probative value of evidence is substantially
outweighed by the danger of unfair prejudice under the abuse of discretion
standard."  Commonwealth v. Yat Fung
Ng, 491 Mass. 247, 264 (2023).  Under
this standard, we do not disturb the judge's ruling "absent a clear error
of judgment in weighing the relevant factors" (citation omitted).  Id.  
      v. 
Application.  The parties
vigorously dispute the judge's Daubert-Lanigan ruling.  The defendant argues that he was prejudiced
by the judge's exclusion of expert testimony necessary to support Dudley's
opinion that the defendant was in the throes of a psychotic episode at the time
of the murder.  The judge's dismissal of
sMRI-based volumetric analysis as a mere "research tool" that is
"not used in clinical treatment," he argues, was a misapplication of
the Daubert-Lanigan standard.  The
Commonwealth, on the other hand, emphasizes that the issue before the judge was
"not the validity in general of sMRI as a tool to measure brain volume or the
fact that research has linked volumetric reductions to
schizophrenia."  Rather, it was the
reliability of sMRI imaging of the defendant's sixteen year old brain to
support an inference that he suffered from schizophrenia at the time of the
incident, even though "the defendant was not (and has never been)
diagnosed with schizophrenia."  We
need not reach the correctness of the judge's Daubert-Lanigan determination,
however, because the judge relied on an adequate alternative ground to exclude
the sMRI brain scan testimony. 
      The judge acted within his discretion in
ruling that the probative value of the proffered expert testimony was
substantially outweighed by unfair prejudice. 
See Hoose, 467 Mass. at 417; Mass. G. Evid. § 403.  On this record, the judge was entitled to
determine that the probative value of the sMRI brain scan results was
diminished by questions raised about the adolescent cohort comparison.  He observed, "Nobody in the study was of
the same age of the defendant at the time of the incident."  This was significant because, as Satterthwaite
testified, the brain undergoes "a lot of volumetric changes"
throughout the developmental process. 
Adding to the judge's concerns about the cohort, he noted that
"there's no indication of whether the sixty-one youths . . .
were followed to see whether they ever developed brain disorders."  The judge also considered the undisputed
testimony that sMRI brain scans may not be used to diagnose schizophrenia
absent clinical findings.  Despite this
undisputed testimony, Satterthwaite would have essentially invited the jury to
speculate that "since the volumetric values of the defendant's brain are
consistent with somebody with schizophrenia, . . . the defendant has
schizophrenia."
      Additionally, in assessing the probative
value of Satterthwaite's proffered testimony, the judge relied on a 2014 Emory
University multidisciplinary consensus conference report which, he stated,
raised "serious cautions" about the use of neuroimaging data in
criminal cases.  The report states:
"The
practice of performing imaging studies on a defendant in order to shed light on
brain function or state of mind at the time of a prior criminal act is
problematic.  The retrospective nature of
this evaluation makes it particularly difficult to attribute causality to
specific imaging findings.  Current brain
imaging methods cannot readily determine whether a defendant knew right from
wrong or maintained criminal intent or mens rea at the time of the criminal
act.  Also, there is an inherent
difficulty in translating mechanistic (neural) system data into human
behavior."  
Meltzer et al.,
Guidelines for the Ethical Use of Neuroimages in Medical Testimony:  Report of a Multidisciplinary Consensus
Conference, 35 Am. J. Neuroradiology 632, 635 (2014). 
      The judge was also warranted in
determining that the expert testimony would be unduly prejudicial to the
government.  The evidence invited the
jury to impermissibly speculate that the defendant had, in fact, been diagnosed
with schizophrenia based on objective sMRI studies.  The prejudice could not be, as the judge
determined, "mitigated through cross-examination."
      We also discern no abuse of discretion in
the judge's exclusion of this evidence on surrebuttal to refute evidence of
malingering.  The judge credited testimony
from Kinscherff that raised significant questions about the probative value of
the sMRI brain scan results. 
Specifically, Kinscherff testified, "given the existing state of
science," a diagnosis of schizophrenia "cannot be made on the basis
of laboratory testing." 
Additionally, although Kinscherff acknowledged that brain volume
reductions are associated with schizophrenia, he explained that "they are
[also] associated with normal aging . . . [and] a lot of different
conditions.  So . . . it is not
pathognomonic [(distinctly characteristic of a disease)] or specific to
schizophrenia."  Finally, it was
undisputed that a person could suffer from a mental illness (as the defendant
argued the sMRI brain scan demonstrated), and still exaggerate symptoms of
mental illness.  
      In sum, we discern no abuse of discretion
in the judge's decision to exclude the expert testimony because its probative
value was substantially outweighed by the danger of unfair prejudice.    
      b. 
The limitations on the defendant's direct examination of his
expert.  The defendant next contends that
he was unable to present a complete criminal responsibility defense because the
judge precluded Dudley from testifying on direct examination to statements made
by the defendant during his forensic interviews with Dudley.  While acknowledging the general prohibition
against the introduction of such evidence, see Department of Youth Servs. v. A
Juvenile, 398 Mass. 516, 532 (1986), he argues that the statements were
admissible under two evidentiary hearsay exceptions, see Mass. G. Evid.
§ 803(3), (4), or the narrow constitutionally based exception for
statements critical to the defense, see Commonwealth v. Drayton, 473 Mass. 23,
25 (2015), S.C., 479 Mass. 479 (2018). 
Because the defendant objected based on the foregoing evidentiary rules,
we review to determine whether the exclusion of the evidence was error and, if
so, whether it was prejudicial.  See Yat
Fung Ng, 491 Mass. at 263 n.17.
      Dudley interviewed the defendant seven times
from March to December 2015.  The details
of these interviews, the defendant claims, reveal the true nature of his
delusionary and hallucinatory world.  In
particular, the defendant made statements during these interviews that involved
his obsession with anime and his belief that he was "a Manga character or
a Ninja."[8]  The defendant also
told Dudley that he was hearing voices. 
The voices said negative things about him, directed him to do things,
made him feel helpless because he could not control them, and pulled him
"deeper and deeper in."
      The judge denied the defendant's motions
in limine to admit this evidence on direct examination.  He explained, citing the then-recently
decided case of Commonwealth v. Chappell, 473 Mass. 191, 204-205 (2015), that
this court's precedent is well settled: 
an expert witness may rely on facts or data not in evidence in
formulating an opinion, but the expert cannot testify to the substance or
contents of that information on direct examination.  The judge added that this case law does not
preclude an expert witness from stating an opinion and the bases for that
opinion absent the underlying facts and data. 
The defendant objected, arguing that the ruling had "hamstrung"
his case to the point that the criminal responsibility defense had been
"eviscerated."  
      An expert witness may base an opinion on
"(1) facts personally observed; (2) evidence already in the records or
which the parties represent will be admitted during the course of the
proceedings, assumed to be true in questions put to the expert witnesses; and
(3) facts or data not in evidence if the facts or data are independently
admissible and are a permissible basis for an expert to consider in formulating
an opinion" (quotation and citation omitted).  Commonwealth v. Markvart, 437 Mass. 331, 337
(2002).  See Mass. G. Evid.
§ 703.  As the trial judge here
correctly noted, while an expert may provide an opinion based on facts or data
not in evidence, "the expert may not testify to the substance or contents
of that information on direct examination."  Department of Youth Servs., 398 Mass. at
531.  See Commonwealth v. Piantedosi, 478
Mass. 536, 543 (2017); Chappell, 473 Mass. at 203; Mass. G. Evid.
§ 703.  The rationale for this
limitation is to prevent the proponent of the expert testimony from
"import[ing] inadmissible hearsay into the trial."  Commonwealth v. Goddard, 476 Mass. 443, 448
(2017).  That is, "[d]isallowing
direct testimony to the hearsay basis of an expert opinion helps prevent the
offering party from slipping out-of-court statements not properly in evidence
in through the 'back door.'" 
Commonwealth v. Greineder, 464 Mass. 580, 583, cert. denied, 571 U.S.
865 (2013).
      Notwithstanding the limitations on
direction examination, the opposing party may, as a matter of trial strategy,
elicit details of the facts or data underlying the expert's opinion on
cross-examination.  Markvart, 437 Mass.
at 338.  If the door is opened by the
opposing party, on redirect examination, the proponent of the evidence then may
introduce additional details surrounding the source of the expert's
opinion.  Chappell, 473 Mass. at
203–204.  See Mass. G. Evid. § 705. 
Here,
the defendant maintains that the details of his forensic interviews were
admissible on direct examination under three exceptions to the hearsay
rule:  (1) statements for purpose of
medical diagnosis or treatment, see Mass. G. Evid. § 803(4); (2)
statements of then-existing mental, emotional, or physical condition, see Mass.
G. Evid. § 803(3); (3) or the narrow, constitutionally based exception for
statements that are critical to the defense. 
See Drayton, 473 Mass. at 33-35.  
The
defendant's reliance on the exception for statements made for purposes of
diagnosis or treatment is foreclosed by our decision in Commonwealth v.
Rodriguez, 484 Mass. 677 (2020).  In that
case, we rejected the defendant's argument that statements made to an expert
psychiatrist in a forensic interview were admissible, without limitation, under
Mass. G. Evid. § 803(4).  Rodriguez,
supra at 684.  Notwithstanding an expert
witness's reliance on such statements in reaching a mental illness diagnosis,
this hearsay exception "does not apply where a defendant made his or her
statements in the course of a court-ordered forensic interview or a forensic
interview to determine criminal responsibility."  Id.  We
explained that "[t]he reason for these forensic interviews is to assess
the defendant for a legal purpose:  to
determine whether the defendant meets the legal definition of a 'mental disease
or mental defect' and therefore cannot be held criminally responsible for the
crime charged. . . . 
Therefore, the statements made during the course of these assessments do
not carry the same inherent reliability as statements made to a professional
for purposes of medical treatment or diagnosis."  Id. 
Accordingly, the judge properly rejected the defendant's claim that the
statements made to Dudley in the forensic interviews were admissible under
Mass. G. Evid. § 803(4).  
Next,
we address the defendant's argument that certain details of his forensic
interview were admissible on direct examination as statements of a
then-existing mental condition.  See
Mass. G. Evid. § 803(3).  Notably,
this exception does not cover out-of-court statements describing past symptoms
of mental illness.  See Commonwealth v.
Schoener, 491 Mass. 706, 728 (2023); Yat Fung Ng, 491 Mass. at 260;
Commonwealth v. Whitman, 453 Mass. 331, 342 & n.10 (2009).
The
defense proffered Dudley's testimony that the defendant stated that "he
thought he was a [manga] character" and "that he really is a
Ninja."  It is unclear whether these
statements described the defendant's past or current mental states, or
both.  To the extent that the defendant
sought to establish his past mental condition (i.e., that he thought he was a
fictional character), the statement was not admissible as a statement
of then-existing mental condition. 
See Whitman, 453 Mass. at 342.  
In
any event, whether the "Ninja" statement refers to the defendant's
past or present mental condition, there is no dispute that another proffered
statement referred to the defendant's mental condition at the time of the
expert's evaluation.  The defendant told
Dudley that he was hearing voices during the forensic evaluation.  Dudley reported, "[H]e was hearing a
voice (other than this psychiatrist's voice) . . . when this
psychiatrist questioned him about the fact that he often appeared to be distracted
and mumbling to himself." 
The
judge excluded the proffered statements as "not . . . within the
contemplation of [the] then-existing mental or physical condition
exception."  The exception, he
reasoned, does not apply to the "artificial environment" of an
examination for criminal responsibility.[9] 
He further reasoned that a contrary ruling "would eviscerate the
whole principle as it relates to the way expert testimony is addressed in the
Commonwealth."  See 2 McCormick on
Evidence § 274 (R.B. Mosteller ed., 8th ed. 2020) (exception "rests
upon the [statements'] spontaneity and resulting probable sincerity"); 6
Wigmore, Evidence § 1714 (Chadbourn rev. ed. 1976) ("statements
. . . where there is ample opportunity for deliberate
misrepresentation . . . are comparatively inferior to statements made
at times when circumstances lessened the possible inducement to
misrepresentation"). 
Because
the defendant was not prejudiced by the ruling, there is no need to decide
whether the "artificial environment" of a forensic evaluation
diminishes the reliability of a statement of then-existing mental
condition.  Dudley testified on direct
examination that the defendant exhibited "auditory hallucinations"
that "ebbed and flowed during the interviews" and delusional ideas
that he "was kind of nonhuman with nonhuman powers."  Dudley also described the defendant's
auditory hallucinations on redirect examination:  "[W]hat I was describing during my
interviews with him is that I would ask him a question, . . . the
voice would tell him to respond or not respond, and he would be responding to
the voice and then not responding to me."[10]  In light of the statements concerning the
defendant's mental state that were admitted, we are sure that any error in the
exclusion of any statements on direct examination "did not influence the
jury, or had but very slight effect" (citation omitted).  Yat Fung Ng, 491 Mass. at 263 n.17.
We
also consider the defendant's claim that all of the details of his statements
to Dudley were admissible under the narrow, constitutionally based exception to
the hearsay rule.  See Drayton, 473 Mass.
at 25, 33-35 (recognizing "a narrow, constitutionally based exception to
the hearsay rule, which applies where otherwise inadmissible hearsay is
critical to the defense and bears persuasive guarantees of
trustworthiness").  This exception
applies "only where it is necessary to avoid injustice where
constitutional rights directly affecting the ascertainment of guilt are
implicated or where exclusion of evidence significantly undermines fundamental
elements of a defendant's defense" (quotations, citations, and alterations
omitted).  Yat Fung Ng, 491 Mass. at
261.  The defendant did not raise this
argument in the trial court; therefore, we review for a substantial likelihood
of a miscarriage of justice.  Id. at 261
n.16.  We find no error because admission
of the statements on direct examination was not critical to the defense.  As stated above, the defendant was able to
introduce evidence of auditory hallucinations and delusional thinking through
his expert witness.  Furthermore, the
defendant could have testified to his own then-existing mental state.  See Commonwealth v. Dame, 473 Mass. 524, 533
n.17, cert. denied, 580 U.S. 857 (2016). 

Finally,
the defendant argues that his statements were admissible on Dudley's redirect
examination to rebut the claim elicited by the Commonwealth that the defendant
was malingering.  However, in excluding
evidence of the defendant's statements, the judge emphasized that his ruling
was confined to Dudley's direct examination, not redirect.  He stated, "I'm not ruling, at this
moment, on redirect. . . .  I
haven't heard the cross.  I haven't even
heard the direct."  Thereafter, the
defendant did not ask the judge to decide this evidentiary issue.  Therefore, even assuming the Commonwealth
opened the door to allow the defendant to introduce his statements on redirect
examination of Dudley, no error was committed by the judge.
c.  The Commonwealth's cross-examination of the
defendant's experts.  The defendant
further contends that he is entitled to a new trial because the prosecutor was
permitted to cross-examine defense experts on irrelevant and prejudicial
topics.  In particular, he claims that
the judge erred in permitting the prosecutor to inquire about (1) the possibility
that the defendant suffered from antisocial personality disorder (ASPD); (2)
Dudley's testimony in infamous criminal cases; and (3) an article written by
Dudley concerning the strategic use of psychological testing in death penalty
mitigation cases.  
We
first consider the defendant's claim that the prosecutor improperly elicited
testimony "insinuating" that the defendant suffered from ASPD.  This was prejudicial error, the defendant
argues, because ASPD cannot be diagnosed in someone under the age of
eighteen.  He maintains also that the
judge should have permitted Dudley to rebut the suggestion of ASPD on redirect
examination through testimony that the defendant's mental condition improved
while he was medicated on Risperdal.
The
relevant portions of expert witness examination proceeded as follows.  Defense expert Jackson testified, on direct
examination, that he prescribed the defendant Risperdal, "an
anti-psychotic medication that's quite efficacious for helping people organize
their thinking."  As a result, the
defendant seemed "significantly more present and engaged,"
"calmer and less anxious," and "better able to organize his
thinking and his communication with others."  On cross-examination, the prosecutor asked
Jackson whether the defendant exhibited signs of a personality disorder, such
as an absence of empathy or inability to connect with other people.  The prosecutor also asked whether ASPD
"would be a disorder for which those things are true."  Defense counsel objected on the ground that
the defendant was too young to be diagnosed with ASPD.  At sidebar, the judge sustained the objection
and would not take the testimony de bene without further foundation.  The prosecutor countered that ASPD is a
potential differential diagnosis and offered to limit her inquiry to the last
question.  Defense counsel withdrew her
objection.  Jackson then testified that
lack of empathy, connections to others, and remorse are characteristics of
ASPD.
On
redirect examination of Dudley, the defendant sought to admit evidence of
Dudley's late-trial interview of the defendant, which was not timely disclosed
to the prosecutor.  The proffered
testimony, according to the defense, was to be limited to "improvements in
[the defendant's] condition . . . due to the [Risperdal], the
antipsychotic medication."  The
judge excluded the evidence, determining that its "extremely limited"
probative value was substantially outweighed by the danger of unfair prejudice
caused by delayed disclosure.
We
find no prejudicial error in the judge's rulings regarding the scope of cross-
and redirect examination.  See
Commonwealth v. Chicas, 481 Mass. 316, 320 (2019) (judge's discretion to limit
scope of examination); Mass. G. Evid. § 611(a) (court may exercise
reasonable control over mode and order of witness examination).  Jackson disagreed with the suggestion that
the defendant suffered from a personality disorder.  Rather than litigate the issue whether the
defendant's age precluded such a diagnosis, the defendant withdrew his
objection to a final question concerning characteristics of ASPD.  Thereafter, Dudley testified that a
personality disorder cannot "technically" be diagnosed at age
fourteen or fifteen.  He nonetheless
"look[ed] for some of the kinds of behavioral difficulties or symptoms
that we see early on in people who tend to develop certain personality
disorders," and found none. 
Kinscherff, the Commonwealth's expert, did not diagnose the defendant
with ASPD, and the prosecutor did not mention it in her closing argument.
Likewise,
the judge did not abuse his discretion in excluding Dudley's opinion on the
positive effects of Risperdal, as it was cumulative.  Prior to Dudley's redirect examination,
Jackson testified to the efficacy of Risperdal in treating the defendant's
mental condition.  Indeed, defense
counsel, seeking to rebut the Commonwealth's claim of malingering, argued to
the jury:  "[Jackson] treated those
things [(disorganized thoughts, flat affect, and social withdrawal)] with an
antipsychotic medication, Risperdal. 
This was not that long ago.  And
what happened?  There was a marked change
in [the defendant], not based on [the defendant's] report, but based on Doctor
Jackson's observations . . . ." 
The
defendant next argues that the judge erred in permitting cross-examination of
Dudley regarding his role as an expert witness in infamous murder cases, while
prohibiting the defendant from offering evidence that Dudley testified in Hague
genocide cases.  We find no abuse of
discretion.  See Chicas, 481 Mass. at
320.  On direct examination, Dudley
testified that he mostly appears as a defense witness because "[t]hat's
who calls [him]."  The Commonwealth
inquired into Dudley's potential bias. 
See Commonwealth v. Aguiar, 400 Mass. 508, 513 (1987) (right to
cross-examine on issue of bias).  The
prosecutor asked Dudley about his role as a defense expert in three infamous
criminal cases:  (1) the case of Colin
Ferguson, "who shot people on the Long Island Commuter Rail"; (2) the
case of Brian Nichols, "who killed a judge and three other people in
Atlanta"; and (3) the case of "one of the defendants in the Cheshire,
Connecticut[,] home invasion rape and murder of a mother and her two
daughters."  The judge provided an
immediate and forceful limiting instruction that this evidence was to be
considered solely as to Dudley's pro-defense bias.  See Commonwealth v. Jones, 373 Mass. 423, 426
(1977) (it is normally assumed jury follow judge's instructions).
Dudley,
on redirect examination, informed the jury that he testifies in many criminal
and civil cases "where there's been no publicity."  He added, "I've recently done several
Hague Convention cases, which are kind of kept quiet."  The judge sustained the prosecutor's
objection to the question, "What are Hague Convention cases?"  At sidebar, defense counsel insisted that
Dudley be permitted to define "what the Hague Convention is."  Asked for an offer of proof, defense counsel
admitted that she did not know how Dudley would answer this question.  The judge invited defense counsel to talk to
Dudley during recess, and "come back to it."  The defense declined to revisit the
issue.  
Finally,
we find no abuse of discretion in the judge's decision to allow the
Commonwealth to cross-examine Dudley regarding an article he authored on
developing mitigation evidence in capital cases.  The Commonwealth asked Dudley about portions
of that article where he cautioned defense counsel against prematurely ordering
psychological testing.  Dudley explained
that counsel should gather records, "really try to get to know who this
client is," and select a mental health expert "who's going to be most
helpful . . . given what your client's needs are."  When pressed by the prosecutor, Dudley
answered that the wrong psychological testing could undermine the defense's
case.  The prosecutor finished this line
of inquiry by highlighting the fact that Dudley was late to order
"psychological" testing in this case.
The
Commonwealth was entitled to ask Dudley about the strategic use of
psychological testing.  To the extent
that the inquiry strayed from this purpose, the defendant was not prejudiced by
the cross-examination.  Dudley emphasized
that the article was written to set a national standard of practice in capital
cases, which are "very different" from criminal responsibility
cases.  Furthermore, Dudley explained
that he ordered sMRI brain scan testing in this case under the belief that this
type of testing would provide "clear[er]" results than psychological
testing, and that he considered the brain scan results in reaching his
diagnosis of psychosis not otherwise specified. 

d.  The disclosure of raw test data from the
defendant's nontestifying expert consultants. 
At trial, on the Commonwealth's motion, the judge ordered the defense to
produce raw data from psychological tests administered by the nontestifying
expert consultants.  The defendant
objected to the order, arguing that the rules governing pretrial discovery do
not compel disclosure of raw data from tests that were not requested or
reviewed by the defendant's testifying expert. 
We hold, first, that the judge abused his discretion in compelling
disclosure of the raw data in these circumstances.  Second, we hold that the judge's abuse of
discretion did not result in prejudicial error. 

i.  Background. 
Pursuant to Mass. R. Crim. P. 14 (b) (2), as appearing in 463
Mass. 1501 (2012), the defendant provided notice of his intent to offer expert
testimony regarding the defendant's mental condition, which would rely, in
part, on his statements.[11]  The
Commonwealth then moved for a court-ordered examination of the defendant by its
testifying expert, Kinscherff, and further requested an order that Kinscherff
be provided "any psychiatric, psychological and/or medical records or
testing of the defendant . . . regardless of whether they will be
provided to or relied upon by the defense expert in forming any
opinions."  The Commonwealth
similarly moved for a court order requiring the defendant to disclose the
specified raw data to another one of its testifying experts, Hebben, who
intended to assist Kinscherff with his evaluation by conducting her own
psychological testing.  The defendant
objected that, "[t]o the extent that the Commonwealth's proposed order
encompasses records other than those provided to the defense experts[,]
. . . it should be denied as outside the scope of discovery expressly
provided for by [rule 14 (b) (2)] as modified by Hanright."  See Commonwealth v. Hanright, 465 Mass. 639,
648-649 (2013).  The defendant explained
that (1) he had no intention of calling the expert consultants who had
performed the relevant tests and (2) his testifying expert, Dudley, had neither
reviewed nor relied upon the raw data generated by those tests in forming his
opinion.  
The
judge allowed the Commonwealth's motions and stated, with respect to the
request for raw data: 
"The present
case is dissimilar to the situation contemplated in Commonwealth v.
Sliech-Brodeur, 457 Mass. 300, 321 (2010), where the Commonwealth's expert was
'not entitled to any of [the defense expert's] materials before trial and
before he had prepared his own report . . . .'  The court's decision is based on the
'anti-cherry picking' spirit of the . . . same records rule
established in [Hanright, 465 Mass. at 644 & n.4] ('[i]t is only fair that
the Commonwealth have the opportunity to rebut the defendant's mental health
evidence using the same records that should be made available to defendant's
medical expert')." 
The defense
thereafter complied with the judge's order, providing the raw data to both
Hebben and Kinscherff.  Included in the
raw data were the results of two types of intelligence quotient (IQ)
tests:  (1) the Wechsler Intelligence
Scale for Children (WISC), which the defendant completed in March 2014; and (2)
two subtests from the Wechsler Adult Intelligence Scale (WAIS), which the
defendant completed in June 2015.
The
Commonwealth utilized divergent results in the IQ scores to bolster its claims
that the defendant was malingering and not suffering from a mental disease or
defect.  In cross-examining Dudley, the
prosecutor pointed out that the defendant's WISC scores ranged from average to
above-average intelligence.  Thereafter,
in June 2015, he scored below the first percentile on the WAIS.  Dudley acknowledged that intelligence does
not change over the course of a lifetime. 
The prosecutor suggested that the results of the subsequent IQ testing were
attributable to malingering.  Dudley
testified that he "considered [the IQ test results], and [they] didn't
change [his] opinion." 
In
addition, the prosecutor brought out the disparity in IQ test scores through
Hebben.  On direct examination, Hebben
testified that she reviewed the raw data after completing her testing and
reached her own independent conclusions. 
Her opinion was "based solely on the data that [she] personally
collected."  Then, on redirect
examination, she explained that the WISC and WAIS IQ tests are highly
correlated -- and therefore, varying scores "[did] not make any sense at
all," absent a significant brain injury. 
The only explanation, she opined, was that "[t]he person was
purposefully feigning that [he was] unable to do now cognitive tests."
ii.  Standard of review.  "This court upholds discovery rulings
unless the appellant can demonstrate an abuse of discretion that resulted in
prejudicial error" (quotations, citation, and alteration omitted).  Commonwealth v. Torres, 479 Mass. 641, 647
(2018).  As noted previously, a judge
commits an abuse of discretion where he or she "made a clear error of
judgment in weighing the factors relevant to the decision, such that the
decision falls outside the range of reasonable alternatives" (quotation
and citation omitted).  L.L., 470 Mass.
at 185 n.27.  With respect to prejudicial
error, the controlling question is whether the appellate court can be
"sure that the error did not influence the jury, or had but very slight
effect" (citation omitted). 
Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).  An error is prejudicial if there is a
"reasonable possibility that [it] might have contributed to the jury's
verdict" (citation omitted). 
Commonwealth v. Crayton, 470 Mass. 228, 253 (2015).  
iii.  Analysis. 
There is some disagreement between the parties about what law of
pretrial discovery applies.  The
Commonwealth argues that Mass. R. Crim. P.
14 (b) (2) (C) (i) (2016) applies, under which defendants
subject to a rule 14 (b) (2) (B) examination "shall
. . . make available to the examiner . . . [a]ll raw data
from any tests or assessments administered to the defendant by the defendant's
expert or at the request of the defendant's expert."  The defendant emphasizes that rule
14 (b) (2) (C) (i) was promulgated one month after trial in
this case.  Accordingly, the defendant
frames his argument in terms of rule 14 (b) (2) as it existed when
the motion judge allowed the Commonwealth's motion.  Specifically, the defendant points to
Hanright's "same records" rule, "whereby a defendant is to
provide the rule 14 (b) (2) (B) examiner with the same records
provided to or considered by the defense expert."  Hanright, 465 Mass. at 648–649.  
We
hold that both Hanright and rule 14 (b) (2) (C) (i) point
to the same conclusion:  the motion judge
erred in compelling disclosure of raw data from tests that were neither
administered nor requested by the defendant's testifying expert.  We will first explain why Hanright's
"same records" rule does not extend to raw data from tests
exclusively administered by nontestifying experts.  We will then explain why rule
14 (b) (2) (C) (i) reinforces, and does not disturb, that
holding.  
As
a threshold matter, we emphasize that Hanright concerned a defendant's
disclosure obligations with respect to historical treatment records.  See Hanright, 465 Mass. at 648.  Indeed, the anti-"cherry picking"
principle, one of our considerations in formulating the "same
records" rule, expressly refers to treatment records:  "We are . . . concerned that a
defendant may 'cherry pick' from amongst his or her treatment records
. . . ."  Id.  Hanright did not concern a defendant's
disclosure obligations with respect to materials contemporaneously generated by
the defense.  We were explicit on this
point:  "Unlike access to materials
generated contemporaneously by the defense, allowing a rule
14 (b) (2) (B) examiner access to a defendant's treatment
records is part and parcel of a rule 14 (b) (2) (B)
examination.  Our conclusion
. . . permits discovery of materials that are available to, as opposed
to generated by, the defense . . . ."  Id. at 645 (distinguishing treatment records
from notes and materials generated by defendant's psychiatric expert in
Sliech-Brodeur, 457 Mass. 300).  
Psychological
tests administered by a consulting expert in the context of exploring potential
defenses based on mental condition exemplify "materials generated
contemporaneously by the defense." 
Furthermore, "materials generated contemporaneously by the defense"
are different from historical treatment records in several relevant
respects.  For one, historical treatment
records carry a presumption of reliability that does not necessarily apply to
materials generated for purposes of the defense.  See, e.g., Commonwealth v. Wall, 469 Mass.
652, 667 (2014) (hospital records are distinctively reliable, "because the
entries relating to treatment and medical history are routinely made by those
responsible for making accurate entries and are relied on in the course of
treating patients" [citation omitted]). 
More broadly, psychological data generated by the defense implicates
concerns about self-incrimination, attorney-client privilege, and the work
product doctrine that are not implicated by treatment records generated outside
the context of litigation.  See, e.g.,
Blaisdell v. Commonwealth, 372 Mass. 753, 757-759 (1977) (discussing
burdens of court-ordered psychiatric examinations on privilege against
self-incrimination).  Because of these
relevant differences, Hanright's "same records" rule for treatment
records does not apply to materials contemporaneously generated by the defense.
More
fundamentally, even if Hanright's "same records" rule were extended
to contemporaneously generated defense materials, it could not reasonably be
extended to materials generated by nontestifying experts.  When this court instituted the requirement
for a defendant to "provide the rule 14 (b) (2) (B)
examiner with the same records provided to or considered by the defense expert,"
it was plain that our use of the term "defense expert" referred to
the defense's testifying expert. 
Hanright, 465 Mass. at 649.  This
reflects the motivation behind the "same records" rule -- to ensure,
out of fundamental fairness, that both the Commonwealth's and the defense's
experts have access to the same materials in forming the requisite opinions and
writing the requisite reports.  And only
experts expected to testify need do so. 
"It is only fair that the Commonwealth have the opportunity to
rebut the defendant's mental health evidence using the same resources that
should be made available to [the] defendant's medical expert.
. . .  A system in which only
the defendant's expert may use the defendant's medical and psychiatric records
to form an opinion regarding the defendant's mental health would have a
distorting effect on the fact finder's role, and would undermine society's
conduct of a fair inquiry" (quotations and citations omitted).  Id. at 644-645.  See id. at 643-644 ("Because review of
treatment records is necessary, both to conduct a meaningful examination and to
produce the requisite report, discovery of a defendant's treatment records is
permitted pursuant to rule 14 [b] [2] [B]").
Subsequent
changes to rule 14 (b) (2) confirm our conclusion that only
psychological data generated by testifying defense experts is subject to
mandatory disclosure.  Specifically, in
2015, the standing advisory committee on the rules of criminal procedure
responded to our request in Hanright, 465 Mass. at 648, to "consider the
scope of requisite disclosure and to propose a mechanism whereby both the
defense expert and the rule 14 (b) (2) (B) examiner have an
equal opportunity to access the records they deem necessary to conduct a
psychiatric evaluation, while preserving a defendant's ability to object to
such disclosure."  With respect to
raw data in particular, the result was Mass. R. Crim. P.
14 (b) (2) (C) (i), providing in relevant part that a
defendant subject to a rule 14 (b) examination shall "make available
to the examiner . . . [a]ll raw data from any tests or assessments
administered to the defendant by the defendant's expert or at the request of
the defendant's expert."
Although
the text of rule 14 (b) (2) (C) (i) does not expressly
identify "the defendant's expert" with "the defendant's testifying
expert," both the context and purpose of rule
14 (b) (2) (C) make clear that this is the only reasonable
interpretation.  As a textual matter, the
multiple references to defense "experts" in rule 14 (b) (2)
concern experts who are expected to testify. 
See, e.g., Mass. R. Crim. P. 14 (b) (2) (A) (notice
of intent to raise mental condition defense must state "whether the
defendant intends to offer testimony of expert witnesses" and "the
names and addresses of expert witnesses whom the defendant expects to
call"); Mass. R. Crim. P. 14 (b) (2) (B) ("The
reports of both parties' experts must include a written summary of the expert's
expected testimony . . ."). 
Indeed, at no point does rule 14 (b) (2) reference a defense
"expert" who is not expected to testify.  Moreover, the purpose of the raw data
disclosure requirement articulated in the Reporter's Notes explicitly appeals
to the relevance of raw data for expert reports.  See Reporter's Notes (2015) to Mass. R. Crim.
P. 14 (b) (2) (C), Massachusetts Rules of Court, Rules of
Criminal Procedure, at 382 (Thomson Reuters 2023) ("The raw testing data
that Rule 14[b][2][C][i] requires the defendant to produce consists of
objective, uninterpreted test results . . . .  The intent is to provide both experts with all
of the relevant, objective testing data available at the time each writes his
or her report, thus avoiding the need for supplemental reports or evaluations
that consider pertinent testing data first revealed in the other expert's
report").  
In
sum, the motion judge's reliance on Hanright to justify compelled disclosure of
raw data from psychological tests neither requested nor reviewed by the
defendant's testifying expert was an error of law.  
iv.  Prejudicial error.  It is a further question whether the motion
judge's order qualified as prejudicial error. 
We hold that it did not.  Dudley
insisted that the IQ test scores did not change his opinion.  Kinscherff did not mention the raw testing
data; rather, his opinion rested primarily on video and witness accounts
depicting the defendant's actions, Casey's tests showing an absence of
psychosis, and Hebben's conclusions showing likely malingering.  Nor was the raw testing data in any sense
critical to Hebben's conclusions.  Hebben
administered four psychological tests that were positive for signs of
malingering and reached her opinion independent of the raw data supplied by
nontestifying defense experts.  This
stands in contrast to the disclosure deemed harmful in Sliech-Brodeur, 457
Mass. at 322-323, where the disclosed data was "one of the foundational
reasons supporting [the Commonwealth expert's] opinion that the defendant was
criminally responsible" such that "the over-all strength of the
Commonwealth's case relied heavily on . . . a large quantity of
materials that were erroneously provided to [the Commonwealth
expert]."  Finally, although the
prosecutor briefly mentioned discrepancies between the disclosed raw data and
performance on subsequent tests administered by Hebben in closing argument, we
are assured that this "had but very slight effect" on the jury's
verdict in light of the over-all weight of the Commonwealth's evidence
(citation omitted).  Flebotte, 417 Mass.
at 353.  In these circumstances, we do
not find a "reasonable possibility that the error[] might have contributed
to the jury's verdict" (citation omitted). 
Crayton, 470 Mass. at 253.  
e.  The Commonwealth expert's review of the
defendant's suppressed statements.  The
defendant claims that Kinscherff's testimony was irreparably tainted by his
review of a suppressed Danvers police station interview.  At the least, he argues, the judge was
required to conduct a voir dire hearing to determine the extent of Kinscherff's
reliance on this evidence in formulating his opinion.  The judge's ruling permitting Kinscherff to
testify, he contends, "was intensely prejudicial and violated [the
defendant's] Miranda-based rights, as well as his rights to due process,
against self-incrimination, and to confrontation."
i.  Background. 
On March 3, 2015, the judge allowed the defendant's motion to suppress a
videotaped statement at the Danvers police station.  The judge determined that the Commonwealth failed
to prove a valid waiver of Miranda rights beyond a reasonable doubt.  Prior to the suppression order, Dudley
reviewed the Danvers police station statement as part of his forensic
evaluation.  After the suppression order,
defense counsel instructed Dudley to not rely on the excluded evidence in
forming an opinion about the defendant's mental state.  
In
July 2015, as discussed supra, the Commonwealth moved for a court order
requiring the defendant to produce psychiatric, psychological, and medical
records to Kinscherff.  Later that day,
during a pretrial hearing, defense counsel agreed to provide Kinscherff with
all materials provided to Dudley.  She
stated, "I have no problem -— every record that Dr. Dudley has had I will
send out immediately to the Commonwealth's expert."  In a subsequent hearing that month, defense
counsel stated that she had "sent to Dr. Kinscherff everything we have
provided to our expert, Dr. Dudley," including "all the
documents" and "records."[12]
The
Commonwealth obtained a copy of both expert reports on July 22, 2015.  Dudley's report indicated that he reviewed
"reports, transcript[,] and video of [the defendant's] statement to the
police on 23 October 2013."  It was
unclear whether the videotaped statements referenced in Dudley's report included
the suppressed Danvers police station interview (along with subsequent
interviews not subject to the suppression order).  Meanwhile, Kinscherff incorporated portions
of the defendant's suppressed statement into his ninety-six page report.  
On
the eve of trial, the defendant filed a motion to exclude Kinscherff's
testimony on the ground that it was based, in large part, on the suppressed
interview.  The Commonwealth, in
response, moved to compel Dudley to state the basis of his opinion.  After defense counsel agreed to the
Commonwealth's requested relief, Dudley drafted an addendum to his report.  The addendum, submitted after the trial had
commenced, states: 
"Defense
counsel provided me with a transcript and video of [the defendant's] statement
at the Danvers Police Department. 
However, in March 2015, counsel informed me that I was not to rely on
this statement in forming my opinion because the [c]ourt had issued an order
suppressing the statement.  I therefore
did not rely on the suppressed statement."
Defense
counsel asked the court "to prohibit [Kinscherff] from testifying as the
Commonwealth expert, or, in the alternative, prohibit [Kinscherff] from relying
on the statement in any way in forming his opinion."  She argued also that she could not
effectively cross-examine Kinscherff without opening the door to the suppressed
statements.  Based on Kinscherff's
reliance on sources other than the defendant's suppressed statement, the
Commonwealth made an offer of proof that, "if asked during a voir dire[,]
Doctor Kinscherff would say that none of his conclusions rely on the
statement."  The defendant did not
seek an evidentiary hearing to explore whether Kinscherff's opinion was tainted
by exposure to the suppressed statements. 
See Department of Youth Servs., 398 Mass. at 532 ("If a party believes
that an expert is basing an opinion on inadmissible facts or data, the party
may request a voir dire to determine the basis of the expert's
opinion").  See also Commonwealth v.
Anestal, 463 Mass. 655, 668 (2012); Commonwealth v. Daye, 411 Mass. 719, 742
(1992).  
Relying
on his familiarity with Kinscherff's lengthy report, the judge denied the
defendant's request to strike Kinscherff's testimony.  He did, however, allow the defendant's
alternative request and precluded Kinscherff from offering the suppressed
statements as a basis for his opinion on direct examination.  As for cross-examination, the judge indicated
that questions framed by defense counsel concerning "the basis for
[Kinscherff's] opinion provided on direct [examination]" would not open
the door to suppressed statements.  
ii.  Analysis. 
"We review rulings on the admission of expert testimony for an
abuse of discretion."  Hoose, 467
Mass. at 416.  The defendant, citing
Commonwealth v. Vuthy Seng, 436 Mass. 537, cert. denied, 537 U.S. 942 (2002),
argues that the judge's ruling precluding Kinscherff from mentioning the
Danvers police station statements in his direct examination was not sufficient
to cure the expert's "tainted" exposure to suppressed evidence.  Vuthy Seng is inapposite.  The jury here, unlike the Vuthy Seng jury,
never heard the suppressed statement. 
See id. at 547-548 (admission of defendant's statement made after
defective Miranda warning was not harmless beyond reasonable doubt because
"[t]he statements that the defendant made . . . were used by the
Commonwealth to strike at the heart of his insanity defense").  
Moreover,
the record does not support the defendant's claim that Kinscherff's testimony
was "clearly based" on his exposure to the suppressed Danvers police
station statement.  It was within the
judge's discretion to accept the Commonwealth's offer of proof where
Kinscherff's report detailed his reliance on various other sources of
information, such as his interviews with the defendant, his classmates, and
Tennessee witnesses; the results of several psychological tests taken by the
defendant; and the defendant's educational and Department of Youth Services
(DYS) records.  See Commonwealth v.
McDonough, 400 Mass. 639, 651 (1987). 
Furthermore, Kinscherff's trial testimony referenced admissible
evidence, most notably the video recordings from school surveillance
cameras.  
The
defendant's claim that the ruling "insulated" Kinscherff from
effective cross-examination also fails. 
Defense counsel cross-examined Kinscherff on the topics of adolescent
brain development, the DSM-V's statement that reduced brain volume has been
observed in persons with schizophrenia, and the fact that Kinscherff would
"consider" volume reduction as shown in brain scans.  At no point did defense counsel raise a
concern that a particular line of inquiry would open the door to the suppressed
statement. 
Accordingly,
the judge's decision to deny the defendant's motion to exclude the
Commonwealth's expert witness and allow the defendant's alternative request for
relief did not constitute an abuse of discretion.
      f. 
The adolescent brain development jury instruction.  In his next argument, the defendant contends
that the judge erred in declining to instruct the jury on adolescent brain
development.  The defendant requested
that the judge supplement the deliberate premeditation and extreme atrocity or
cruelty portions of the then-existing model jury instructions on homicide to
inform the jury:  "You may also consider
the defendant's age, developmental maturity, and capacity for reasoned
decision-making."  Noting that the
defendant was free to argue the issue to the jury based on Kinscherff's
testimony, the judge declined to instruct on adolescent brain development.  Because the defendant raised a timely
objection to the omitted instruction, we review for prejudicial error.  See Commonwealth v. Kelly, 470 Mass. 682, 687
(2015).  
There
was no error.  Based on brain science,
social science, and common knowledge, it is well settled that adolescents are
different from adults for constitutional purposes.  Commonwealth v. Odgren, 483 Mass. 41, 48
(2019).  See Commonwealth v. Mattis, 493
Mass. 216, 223 (2024), and cases cited. 
Our differential treatment of juvenile offenders, however, has been
limited to sentencing and does not extend to a juvenile's capacity to formulate
an intent to commit murder.  See Odgren,
supra at 46-48 (instruction permitting jury to infer criminal intent from use
of dangerous weapon was fully applicable to juvenile offender).  See also Commonwealth v. Brown, 474 Mass.
576, 590 n.7 (2016) (United States Supreme Court's focus in Miller v. Alabama,
567 U.S. 460 [2012], was on prohibition against cruel and unusual punishment as
it applied to juvenile sentencing, not to "intent, knowledge or deliberate
premeditation as elements of a crime"). 
We decline, as did the court in Odgren, supra at 48, to "except
juveniles generally from application of our usual jury instructions."
From
this line of cases, the defendant draws an analogy between juvenile brain
development and voluntary intoxication and argues that the judge's failure to
provide the requested instruction "prevented the jury from considering
whether adolescent-brain-development issues interacted with, triggered, or
intensified an underlying mental disease or defect" (quotations and
alteration omitted).  See Commonwealth v.
Dunphe, 485 Mass. 871, 886 (2020); Commonwealth v. DiPadova, 460 Mass. 424, 439
(2011) (Appendix).  
There
are two reasons why this argument fails. 
First, this is not an apt comparison. 
In Fernandes, 487 Mass. at 782-783, we distinguished juvenile brain
development from voluntary intoxication based on the "'legislatively
resolved issue' of whether anyone the defendant's age could formulate the
necessary intent for murder." 
Second, the judge's ruling did not deprive the jury of the ability to
fairly consider the defendant's age. 
Dudley testified that the defendant's "young age" had an
impact on his ability "to really fully appreciate the illness that he was
suffering from," as well as his ability to manage multiple trauma-related
symptoms such as anxiety and agitation. 
Kinscherff, on cross-examination, testified to the differences between
an adolescent brain and an adult brain, which include increased impulsivity and
risk taking in the former.  Finally, in
closing, defense counsel argued: 
"How could a
[fourteen year old] boy cope with an acute psychotic episode?  You heard about the juvenile brain and how the
juvenile brain has an effect on teenagers that makes them very different from
adults.  They have difficulty with making
decisions under stress, with controlling their impulses.  And [the defendant] was no ordinary [fourteen
year old] boy.  He was a [fourteen year
old] boy with the burden of this progressive illness."  
See Odgren, 483
Mass. at 48-49 (noting that jury were "made sufficiently aware of the
impact that the defendant's age and various diagnoses might have on his ability
to form the requisite intent to kill"). 

g.  The sufficiency of the evidence of aggravated
rape and armed robbery.  At trial, the
defendant moved for a required finding of not guilty as to each of the
offenses, both at the close of the Commonwealth's case and at the close of all
evidence.  The defendant's motions were
denied.  On appeal, with respect to the
sufficiency of the evidence of aggravated rape and armed robbery, the defendant
raises the question whether the victim was alive at the time of the aggravated
rape and armed robbery.  In essence, he
contends that the evidence suggested that he committed the actions underlying
these offenses while hiding the victim's deceased body in the woods.  The Commonwealth counters that the evidence
was sufficient to establish that the defendant raped the victim and stole her
underwear inside the second-floor bathroom while she was still alive.  
"In
reviewing the denial of a motion for a required finding of not guilty, this
court must determine whether the evidence, including inferences that are not
too remote according to the usual course of events, read in the light most
favorable to the Commonwealth, was sufficient to satisfy a rational trier of
fact of each element of the crime beyond a reasonable doubt" (citation and
alteration omitted).  Commonwealth v.
Sanchez, 476 Mass. 725, 730 (2017).  A
jury cannot convict if the question of guilt is left to conjecture or surmise,
without an adequate basis of fact. 
Commonwealth v. Shakespeare, 493 Mass. 67, 81 (2023).  At the same time, the Commonwealth is not
required to exclude every reasonable hypothesis of innocence if the trial
record, viewed in its entirety, supports a conclusion of guilt beyond a
reasonable doubt.  Commonwealth v. Platt,
440 Mass. 396, 401 (2003).  We address the
defendant's challenge to the aggravated rape conviction and then turn to the
armed robbery conviction. 
The
crime of aggravated rape requires the Commonwealth to prove, among other
elements, that the defendant had sexual intercourse with the victim and
compelled the victim to submit by force and against her will.  See Commonwealth v. Paige, 488 Mass. 677, 680
(2021); G. L. c. 265, § 22 (a).  Here, the judge further instructed that the
Commonwealth must prove that "[the victim] was alive at the time of
penetration or, in the alternative, . . . that the killing and the
alleged aggravated rape were part of one continuous event."
At
best, the defendant contends, the evidence established that he committed a
sexual assault without penetration in the bathroom or ejaculated on top of the
victim's deceased body in the woods.  To
explain highly inculpatory evidence that his sperm cells were found on vaginal
swabs, he argues that this evidence is "hardly proof" of penetration
given the limited number of cells found in the sample and that "sperm
cells can be accidentally transferred easily."  He also dismisses the significance of a
student's observation of the defendant's exposed buttocks in the bathroom by
pointing out that she did not observe a sexual assault or "notice anything
unusual."
Considered
in the light most favorable to the Commonwealth, the evidence of aggravated
rape was sufficient.  The supporting
evidence included the presence of two sperm cells inside the victim's vaginal
canal.  The cells, which were a partial
DNA match to the defendant, were discovered from a portion of one of the
vaginal swabs treated with several chemicals to extract sperm cells.  Contrary to the defendant's theory of accidental
transfer, the medical examiner explained that "vaginal swab[s] are
actually swabs that are inserted into the vagina, so again that internal
structure that we talked about, versus the external genitalia swabs which are
conducted on the outside of the genitalia."  In addition, the jury could reasonably infer
that the student interrupted the defendant in the act of raping the victim even
though the student just caught a glimpse of the crime.
To
prove armed robbery, the Commonwealth must establish that "the defendant
[took] money or other property from the victim with the intent to steal it,
while armed with a dangerous weapon and by applying actual force to the victim
or putting the victim in fear through the use of threatening words or
gestures."  Commonwealth v. Benitez,
464 Mass. 686, 694 n.12 (2013).  Proof
that the defendant took property "from" the victim requires that the
item taken was "within the presence of the victim" -- i.e., within
her "area of control." 
Commonwealth v. Jones, 362 Mass. 83, 87 (1972).  It is not a robbery if "the intent to
steal is no more than an afterthought to a previous assault."  Commonwealth v. Moran, 387 Mass. 644, 646
(1982).  See Commonwealth v. Stewart, 460
Mass. 817, 821 (2011) (taking must be with intent to permanently deprive person
of her property). 
Here,
it was undisputed that the police discovered the victim's body unclothed from
the waist down and that a Topsfield police officer found a pair of woman's
underwear in the defendant's backpack. 
Nonetheless, the defendant contends that the Commonwealth failed to
prove that he specifically took the victim's underwear "from her
person" in the bathroom.  The
underwear, he argues, could have been taken in the woods where the police found
other articles of clothing, including the victim's black pants.  
The
evidence, and the reasonable inferences drawn therefrom, was sufficient to
prove that the defendant removed the victim's underwear in the bathroom and
took this article of clothing with an intent to permanently deprive.  The defendant emerged from the bathroom
carrying a bundle of clothing with only the victim's black pants visible.  A chemist found bloodstains on the underwear,
but no seminal fluid or sperm cells.  The
absence of seminal fluid or sperm cells, she opined, indicated that the
underwear had been removed prior to the sexual assault.  After the rape and murder, the defendant
placed the victim's underwear in his backpack, along with the victim's wallet
and "survival gear," and fled the scene.  It was reasonable to infer that the defendant
removed the victim's underwear, along with her pants, prior to the rape, and
that he carried these articles of clothing from the bathroom to the woods.  The evidence also supports the inference that
the defendant intended to permanently deprive the victim of her property
because, unlike other articles of her clothing, he kept her underwear.  
h.  The denial of the defendant's motion to
suppress.  The defendant moved to
suppress physical evidence, including the contents of the drawstring backpack
seized by Topsfield police officers, arguing that the evidence was obtained in
violation of his rights under the Fourth Amendment to the United States
Constitution and art. 14 of the Massachusetts Declaration of Rights.  Starting in January 2015, the trial judge
held a four-day evidentiary hearing on the defendant's motion to suppress.  At the conclusion, he denied the defendant's
motion under the inevitable discovery exception to the exclusionary rule.  In reviewing the denial of a motion to suppress,
we accept the motion judge's findings of fact absent clear error and conduct an
independent review of the judge's ultimate findings and conclusions of
law.  Commonwealth v. Jones-Pannell, 472
Mass. 429, 431 (2015).  
The
judge's findings of fact bearing on inevitable discovery, supplemented with
undisputed evidence provided by credited witnesses, are as follows.  See Commonwealth v. Tavares, 482 Mass. 694,
699 (2019).  Officer Hovey responded to a
report of a person walking on Route 1 in Topsfield, at around 12:28 A.M.  This section of highway is unsafe for
pedestrians, especially at night.  It is
police department policy to offer pedestrians encountered on Route 1 transportation
to a safer location.  Hovey parked in the
middle of the road and approached the defendant, who had stopped walking.  The defendant provided odd responses to
Hovey's questions, indicating that he was "coming from . . .
Tennessee," and "going . . . no where."  He also told Hovey that he did not have
identification on him.  During this
exchange, the defendant continued to look straight ahead as if Hovey was not
there.  
      Officer DeBernardo, who joined Hovey,
asked the defendant what was in his backpack. 
The defendant responded, "survival gear."  DeBernardo then seized the backpack.  He escorted the defendant to the other side
of the road, in between the police cruisers, to get out of traffic.  Hovey asked the defendant to empty his
pockets, from which the defendant produced the victim's insurance card, credit
cards, and driver's license.  
Hovey
asked the defendant his name.  He
responded, "Philip Chism." 
Hovey immediately recognized the defendant's name as that of the missing
Danvers teenager.  The officer went into
"parent mode" and was "elated . . . to bring [the
fourteen year old] missing boy back to his parents."  After contacting Danvers police, Hovey
transported the defendant to the Topsfield police station pending further
arrangements to get the defendant home. 
At the police station, Hovey and DeBernardo searched the defendant's
backpack and discovered, among other items, the victim's wallet and underwear,
along with a bloodstained box cutter knife. 

The
Topsfield police department had a written policy for handling juveniles in
custody, including runaways in protective custody.  Under the policy, runaways that are held at
the police station, while awaiting processing and release to a parent or
guardian, are subject to inventory searches of outer clothing, backpacks, or
other containers brought into the police station as personal property.  
The
judge determined that the community caretaking function permitted the officers
to detain the defendant on the busy road at nighttime, question him, and escort
him across the street to a safe location. 
There was no reason, he determined, to reach the more complicated issue
whether the community caretaking function justified the pat frisk of the
defendant or the seizure of his backpack. 
Instead, the judge concluded that incriminating evidence uncovered from
the backpack would have been inevitably discovered pursuant to the Topsfield
police station's inventory policy.  See
Commonwealth v. Hernandez, 473 Mass. 379, 386 (2015), quoting from Commonwealth
v. Sbordone, 424 Mass. 802, 810 (1997) ("evidence may be admissible as
long as the Commonwealth can demonstrate that discovery of the evidence by
lawful means was certain as a practical matter, the officers did not act in bad
faith to accelerate the discovery of evidence, and the particular
constitutional violation is not so severe as to require suppression"
[quotation omitted]).  See also
Commonwealth v. O'Connor, 406 Mass. 112, 119 (1989).  The judge found that "[t]here [was] no
set of circumstances where, after the Topsfield police approached the defendant
on Old Route 1 at approximately 12:30 [A.M.], they would have failed to ask for
his name and discovered he was the missing youth from Danvers."  
The
defendant challenges the judge's finding that, absent the roadside search of
the defendant, the officers would have discovered the defendant's name and
taken him into protective custody.  He
argues that the judge "ignor[ed]" the fact that the defendant
revealed his identity only in response to Hovey's "coercive and
unconstitutional display of authority." 
Because the defendant previously told the officers that he did not have
identification and did not volunteer his name during the roadside encounter, he
contends, it was not certain as a practical matter that he would have revealed
his name.  
We
conclude that the evidence deemed credible supported the judge's determination
that, absent the discovery of the victim's credit cards, it was certain as a
practical matter that the Topsfield officers would have learned the defendant's
name and taken him into protective custody as a runaway.  Hovey, in his initial series of questions,
sought to identify the person located on the busy roadway by requesting
identification.  The defendant replied
that he was not in possession of identification.  Shortly thereafter, Hovey asked the defendant
his name, and the defendant truthfully answered the question.
The
judge's finding that the police would have asked the defendant his name is
supported by the primary purpose of the encounter.  The evidence supports the judge's
determination that the officers "were engaged in community caretaking
throughout their interaction with the defendant on Old Route 1."  See Commonwealth v. Knowles, 451 Mass. 91,
94-95 (2008) (community caretaking function permits officers to "stop
individuals and inquire about their well-being, even if there are no grounds to
suspect that criminal activity is afoot"). 
As the Commonwealth notes, "the defendant's strange answers that he
was going 'nowhere'; had come from 'Tennessee'; did not have identification;
and had no address would leave officers at a loss as to how to assist him"
without determining his identity.  See
Commonwealth v. Armstrong, 492 Mass. 341, 349-350 (2023) (under community
caretaking function, officers were permitted to temporarily detain and question
disturbed motel trespasser for twenty minutes to ascertain his identity and
ensure he was not wanted or missing).  
i.  The prosecutor's closing argument.  The defendant contends that actions and
remarks from the prosecutor exceeded the bounds of proper closing argument by
improperly appealing to the jury's sympathy. 
Specifically, he argues that the prosecutor (1) improperly displayed a
photograph of the victim, taken while she was still alive, to the jury for a
lengthy time period; and (2) improperly urged the jury to dwell on disturbing
crime scene photographs.[13]  Given that
the defendant objected to the prosecutor's use of the victim's photograph, we
review for prejudicial error.  See
Commonwealth v. Robinson, 493 Mass. 775, 788 (2024).  The second, unobjected-to claim is reviewed
under our default standard for substantial likelihood of a miscarriage of
justice.  Commonwealth v. Mello, 420
Mass. 375, 379-380 (1995).  We conclude
that neither the prosecutor's actions nor her statements require a new
trial.  
"The
rules governing prosecutors' closing arguments are clear in
principle."  Commonwealth v. Kozec,
399 Mass. 514, 516 (1987).  A prosecutor
is entitled to forcefully argue for conviction based on the evidence and the
reasonable inferences drawn from that evidence. 
Id.  "Within this framework,
. . . a prosecutor may attempt to fit all the pieces of evidence
together by suggesting what conclusions the jury should draw from the
evidence" (quotations and citation omitted).  Commonwealth v. Rutherford, 476 Mass. 639,
643 (2017).  It is also "well
settled that a prosecutor may not appeal to the jury's sympathy."  Commonwealth v. Lora, 494 Mass. 235, 259
(2024), quoting Commonwealth v. Doughty, 491 Mass. 788, 797 (2023).  See Commonwealth v. Bois, 476 Mass. 15, 34
(2016) ("Prosecutorial appeals to sympathy . . . obscure the
clarity with which the jury would look at the evidence and encourage the jury
to find guilt even if the evidence does not reach the level of proof beyond a
reasonable doubt" [quotation and citation omitted]).  
We
first address the defendant's claim that the prosecutor improperly displayed a
photograph for one minute and forty seconds.  
The photograph, which depicts the victim smiling in a pink sweater, was
previously admitted in evidence.  In that
portion of her thirty-six minute closing argument, the prosecutor addressed the
defendant's claim that command hallucinations rendered him unable to conform his
conduct to the requirements of law.[14]  Specifically, the prosecutor stated: 
"I have
asked you to consider the image of [the victim] in the woods and I will ask you
in your deliberations to examine those autopsy photographs for what they tell
you about the injuries in this case.  But
then I would ask you to return to this image of [the victim].  This was [the victim]. . . .  This is the [victim] who was alone in that
bathroom and in those woods with [the defendant], not a mentally ill child, not
someone powerless to voices in his head. 
The only person powerless in the bathroom, in those woods is [the
victim], because she was alone with the person who robbed her of her underwear,
who raped her, who raped her again with a tree branch, and who murdered her
with deliberate premeditation and with extreme atrocity and cruelty."  
Defense counsel
objected to the "length of the display," not to the content of the
argument, and sought a mistrial rather than a possible curative instruction
offered by the judge.  While expressing
concern about the duration of the display, the judge denied the motion for a
mistrial.  
Viewing
the prosecutor's display of the photograph in context of the evidence before
the jury and the judge's instructions, we discern no prejudicial error.  See Commonwealth v. Coren, 437 Mass. 723,
730-731 (2002).  A prosecutor may
"tell the jury something of the person whose life had been lost in order
to humanize the proceedings, but must refrain, when personal characteristics
are not relevant to any material issue, . . . from so emphasizing
those characteristics that it risks undermining the rationality and thus the
integrity of the jury's verdict" (quotations and citation omitted).  Fernandes, 487 Mass. at 791.  Displaying a vibrant, joyful photograph of
the victim for any length of time, no doubt, evokes sympathy given the horrific
nature of the crimes.  Nonetheless, the
prosecutor's use of a trial exhibit, in these circumstances, did not undermine
the rationality of the jury's verdict. 
See Commonwealth v. Gouse, 461 Mass. 787, 797-798 (2012), reversed on
other grounds by Commonwealth v. Guardado, 491 Mass. 666, 689-690, S.C., 493
Mass. 1 (2023), cert. denied, 144 S. Ct. 2683 (2024) (difficult to conceive of
prejudice to defendant from alleged prolonged display of victim's photograph
during testimony of three witnesses); Commonwealth v. Correia, 65 Mass. App.
Ct. 27, 29-30 (2005) (noting that jury will have exhibits, including victim's
photograph, for entire length of deliberations).  
The
prosecutor displayed the photograph to underscore her argument that the victim,
as opposed to the defendant, was the truly powerless person in the brutal
encounter.  See Rutherford, 476 Mass. at
643, 646 (prosecutor may argue forcefully within bounds of zealous
advocacy).  The argument was material to
an issue raised at trial, i.e., the defendant's ability to control the victim
prior to inflicting deadly force, not a gratuitous appeal to sympathy.  Cf. Commonwealth v. Cheng Sun, 490 Mass. 196,
211-212 (2022) (testimony of victim's son detailing victim's work ethic and
close relationship to his son was improper); Commonwealth v. Alemany, 488 Mass.
499, 513 (2021) (improper argument that victim would never walk down aisle with
her father on her wedding day had no relevance to defendant's guilt).  Furthermore, in context with the trial
evidence, it is unlikely that a less-than-two-minute display of the victim's
photograph had an inflammatory effect on the jury given the shocking nature of
the crime.  See Bois, 476 Mass. at
35.  Finally, the judge mitigated
potential prejudice by repeatedly instructing the jury that verdicts must be
based on the evidence, not feelings of sympathy, and that closing arguments are
not evidence.  
Next,
the defendant asserts that the prosecutor engaged in misconduct by urging the
jury to focus on gruesome crime scene photographs.  The prosecutor argued:
"[T]he only
still image that matters in this case is the image of [the victim] in the
woods, the image that the defendant painted of [the victim] stripped, battered,
brutalized and violated, framed by a fallen fence, the defendant's school bag
discarded nearby with his I.D. like some kind of terrible signature.  That is the only still image in this case
that tells you what was happening in the mind of [the defendant] on October
22nd, 2013.  And that's the image that
Doctor Dudley, despite his thorough preparation, never considered."  
There
was no error because the prosecutor was permitted to refer to crime scene
photographs, admitted as the judge instructed, to demonstrate "the nature
and extent of [the victim's] injuries, as it relate[d] to the state of mind of
the defendant."  See Commonwealth v.
Camacho, 472 Mass. 587, 607 (2015) (prosecutor entitled to focus jury on
disturbing facts where relevant to issue raised in trial). 
j.  The denial of the defendant's motion for a
change of venue.  To address the impact
of pretrial publicity, the defendant moved for a change of venue "to a
county outside the boundaries of the Boston media market."  See Mass. R. Crim.
P. 37 (b) (1), 378 Mass. 914 (1979).  After a hearing, the judge denied the motion,
concluding that the defendant had failed to establish a pretrial presumption of
prejudice requiring a change of venue. 
He reserved judgment on the issue of actual prejudice, and subsequently
denied a renewed motion for a change of venue filed during empanelment.  On appeal, the defendant argues that these
rulings deprived him of his right to trial before an impartial jury.  
"A
trial judge should exercise his or her power to change the venue of a jury
trial with great caution and only after a solid foundation of fact has first
been established" (quotation, citation, and alteration omitted).  Commonwealth v. Clark, 432 Mass. 1, 6
(2000).  The defendant is required to
show either presumptive prejudice or actual prejudice.  See Commonwealth v. Smith, 492 Mass. 604, 609
(2023); Commonwealth v. Toolan, 460 Mass. 452, 462 (2011), S.C., 490 Mass. 698
(2022).  This court reviews decisions on
motions for change of venue for abuse of discretion.  Hoose, 467 Mass. at 405.  
Presumptive
prejudice exists "in the extreme case where a trial atmosphere is so
utterly corrupted by media coverage that a defendant can obtain a fair and
impartial jury only through a change in venue" (quotations and citation
omitted).  Commonwealth v. Entwistle, 463
Mass. 205, 221 (2012), cert. denied, 568 U.S. 1129 (2013).  To determine presumptive prejudice, we weigh
two factors set forth in Commonwealth v. Morales, 440 Mass. 536, 540-542
(2003).  See Commonwealth v. Bateman, 492
Mass. 404, 430 (2023).  First, we examine
"whether the nature of the pretrial publicity was both extensive and
sensational" (quotation and citation omitted).  Commonwealth v. Hart, 493 Mass. 130, 141-142
(2023).  Media coverage is
"extensive" when it is "all-consuming and constant"
(citation omitted).  Id. at 142.  Pretrial publicity is not likely to be
extensive, in contrast, when it "becomes more factual and the frequency of
coverage decreases in the time period between the crimes and jury
empanelment."  Hoose, 467 Mass. at
406.  And publicity "is sensational
when it contains emotionally charged material that is gratuitous or inflammatory,
rather than a factual recounting of the case."  Id. at 407. 
Second, we examine "whether the judge was in fact able to empanel
jurors who appear impartial."  Id.
at 406.
Our
review of the record supports the judge's finding that the extensive media
coverage, while sometimes graphic due to the nature of the crimes, had been
"predominately factual in nature and [had] not risen to the level of
[being] emotionally charged, gratuitous, or inflammatory, even with the
coverage [of] the [d]efendant's alleged [suppressed] confession."  See Morales, 440 Mass. at 540 (media
references to defendant's confession, criminal record, victim's twenty-one year
service as police officer, victim's popularity in community, and memorials in
victim's honor were "significantly short of the type of emotionally
charged, inflammatory, sensationalistic coverage needed to support a
presumption of prejudice" [citation omitted]).  See also United States v. Angiulo, 897 F.2d
1169, 1181 (1st Cir.), cert. denied, 498 U.S. 845 (1990) (no presumption of
prejudice despite frequent characterization of defendant as mafia crime
boss).  
Additionally,
the defendant failed to establish that it was difficult to empanel an impartial
jury.  "Where a high percentage of
the venire admits to a disqualifying prejudice, a court may properly question
the remaining jurors' avowals of impartiality and choose to presume
prejudice" (citation omitted). 
Morales, 440 Mass. at 541.  The
judge individually questioned 140 potential jurors, and less than ten percent
of the venire was excused, either in whole or in part, due to exposure to
prejudicial publicity.  See Hart, 493
Mass. at 142 (no presumption of prejudice where less than twenty percent of
potential jurors were excused); Commonwealth v. Angiulo, 415 Mass. 502, 515
(1993) (no presumption of prejudice where forty-two percent of potential jurors
excused).  
The
defendant also failed to establish that he was actually prejudiced by pretrial
publicity.  See Hoose, 467 Mass. at
408-409.  In a case involving extensive
pretrial publicity, "the voir dire procedures utilized by the judge are
particularly important."  Id. at
408.  After review of the trial
transcript, we conclude that the judge conducted careful and thorough voir dire
to address the potential risks of pretrial publicity.  Over the course of the nine-day empanelment,
potential jurors were cleared for hardship and knowledge of any witnesses, and
were required to fill out a detailed fifteen-page questionnaire.  The questionnaire provided a summary of the
facts of the case and required each potential juror to disclose the
following:  (1) any "knowledge of
this case gained from any source"; (2) the source of such knowledge (with
check boxes for television, radio, newspapers, magazine, Internet, social
media, family or friends, overheard discussion, and other); (3) the details of
the case the juror was able to recall; (4) any awareness of a "specific
impact this criminal allegation has had on [the juror's] community"; (5)
his or her primary source of news; (6) how often he or she read print or online
newspapers (including nine local examples); (7) the frequency of the juror's
exposure to news from radio, television, or social media platforms; and (8) the
juror's familiarity with the case prior to the day of empanelment.  With this information in hand, the judge
asked follow-up questions during individual voir dire to probe the potential
jurors' exposure to pretrial publicity. 
See Morales, 440 Mass. at 542 (right to fair and impartial jury does not
include right to jurors with no prior knowledge of case).  
Of
the twelve jurors who returned a verdict, nine reported not knowing any details
beyond the facts set forth in the court's summary.  One recalled that the "defendant went to
the movies or something afterwards, . . . and then was found later on
Route 1, I think, in Topsfield." 
Another seated juror also recalled "Mr. Chism was picked up on
Route 1."  And the twelfth juror
heard a radio report that the judge was "going to make a decision on
whether the defendant was able to stand trial."  He added, "I don't know what the
decision was, but that's what I heard just briefly.  That's the only thing I've heard about the
case."  See Smith, 492 Mass. at
609-610.  Defense counsel's failure to
challenge any of the seated jurors for cause on grounds of exposure to pretrial
publicity "further belies any claim of juror partiality."  Morales, 440 Mass. at 543.[15]
      Where the defendant failed to establish a
solid foundation of fact establishing presumptive prejudice or actual
prejudice, the judge did not abuse his discretion in denying the defendant's
motions for a change of venue.
      k. 
The proportionality of the aggravated rape and armed robbery sentences
under art. 26.  At the time of
sentencing, the judge, defendant, and Commonwealth assumed, based on Diatchenko
v. District Attorney for the Suffolk Dist., 466 Mass. 655, 661-667 (2013),
S.C., 471 Mass. 12 (2015), that the defendant was entitled to a so-called
Miller sentencing hearing to "consider the defendant's age, the
possibility of rehabilitation, and the brain development of
adolescents."  See Miller, 567 U.S.
at 477-478.  After such a hearing, and
the application of then-existing parole eligibility statutes, the judge
sentenced the defendant to mandatory life imprisonment with the possibility of
parole in twenty-five years for his conviction of murder in the first
degree.  He sentenced the defendant on
the aggravated rape and armed robbery convictions to imprisonment for from
forty years to forty years and one day, to run concurrently with the life
sentence for murder in the first degree -- a sentence, the judge indicated,
that did not "utilize the horrific rape and robbery of [the victim] to
punish the defendant for this unspeakable murder more than the law
allows."  Under the aggregate
sentence, the defendant is parole eligible at age fifty-four.
      The defendant contends that the aggravated
rape and armed robbery sentences must be vacated, and the case remanded for
resentencing, as his current sentence violates the proportionality requirement
of art. 26.  This contention raises two
issues:  first, whether the defendant was
entitled to a Miller hearing to begin with; and second, if so, whether the
judge's consideration of the Miller factors supported his sentence.[16]  
      A juvenile is entitled to a Miller hearing
if a sentence is presumptively disproportionate under art. 26.  See Commonwealth v. Concepcion, 487 Mass. 77,
89 n.19, cert. denied, 142 S. Ct. 408 (2021). 
See also Cepulonis v. Commonwealth, 384 Mass. 495, 497 (1981) ("To
reach the level of cruel and unusual, the punishment must be so
disproportionate to the crime that it shocks the conscience and offends
fundamental notions of dignity" [quotation and citation omitted]).  We have yet to decide the issue presented in
this appeal:  whether a sentence imposed
on a juvenile convicted of both homicide and nonhomicide offenses against the
same victim and sentenced in the aggregate to parole eligibility exceeding that
allowed for a conviction of murder in the first degree is presumptively
disproportionate.  
      Our analysis starts with the art. 26
proportionality principles articulated in Commonwealth v. Perez, 477 Mass. 677,
678-679 (2017) (Perez I), S.C., 480 Mass. 562 (2018) (Perez II), a case
involving the sentencing of a juvenile, convicted of violent nonhomicide
crimes, to imprisonment for over thirty years. 
To assess proportionality, we examined the disparity "between the
sentence imposed on the juvenile and punishments prescribed for the commission
of more serious crimes in the Commonwealth."  Id. at 685, quoting Cepulonis, 384 Mass. at
498.  The lengthy sentence was
presumptively disproportionate, we concluded, because "the aggregate
sentence imposed on this juvenile defendant, albeit for serious crimes, is more
severe -- at least as to parole eligibility -- than a sentence that could be
imposed on a juvenile convicted of murder."  Perez I, supra at 685-686.  "That presumption is conclusive, absent
a hearing to consider whether extraordinary circumstances warrant a sentence
treating the juvenile defendant more harshly for parole purposes than a
juvenile convicted of murder."  Id.
at 686.  See Commonwealth v. Lutskov, 480
Mass. 575, 583 (2018) (youthful offender's mandatory twenty-year minimum
sentence for armed home invasion with resulting parole eligibility exceeding
that applicable for murder was presumptively disproportionate under art.
26).  
      The same reasoning applies to the
defendant's case.  We recognize that the
defendant, unlike the juvenile offender in Perez I, is "a juvenile convicted
of murder."  Notwithstanding that
distinction, the same proportionality benchmark of parole eligibility for
murder in the first degree applies to nonhomicide offenses in the same homicide
case and involving the same victim.  To
hold otherwise risks diminishing State constitutional protections afforded to
juvenile offenders convicted of murder by allowing lengthy sentencing imposed
on the nonhomicide portion of a sentence to dictate parole eligibility.  See Commonwealth v. Wiggins, 477 Mass. 732,
747-748 (2017) (juvenile defendant entitled to resentencing on home invasion
and robbery convictions in light of Diatchenko adjustment to sentence on murder
conviction).  
      The Commonwealth contends that
Commonwealth v. Sharma, 488 Mass. 85 (2021), compels a different result.  Sharma, however, is distinguishable because
the sentences imposed for nonhomicide offenses were not presumptively
disproportionate.  There, a seventeen year
old defendant pleaded guilty to murder in the second degree for the death of
one victim, and two counts of armed assault with intent to murder for shooting
two of the victim's friends.  Id. at
86.  He was sentenced to life in prison
with the possibility of parole for the murder conviction and received two
concurrent sentences of from seven to ten years for the assaults to run
consecutive to the life sentence. 
Id.  The court found the
consecutive sentences not presumptively disproportionate under art. 26.  Id. at 92-93. 
In weighing proportionality, the court determined that the additional
punishment beyond the murder conviction resulted from the defendant's
convictions for the armed assault with intent to murder two others.  Id. 
See Commonwealth v. LaPlante, 482 Mass. 399, 403 (2019) (declining to
set ceiling or floor for aggregate parole eligibility for juvenile offender
convicted of murdering multiple victims). 
Moreover, the sentences of from seven to ten years imposed for the
nonhomicide offenses did not themselves, unlike in the instant case, exceed the
benchmark of parole eligibility for a juvenile convicted of murder in the first
degree.  
      Having determined that the sentences
imposed on the nonhomicide offenses were presumptively disproportionate, the
next question to address is whether the judge abused his discretion in weighing
the Miller factors.  The judge ordered a
presentence investigation.  See
G. L. c. 119, § 58; Mass. R. Crim. P. 28 (d), 378
Mass. 898 (1979).  The report resulting
from that investigation addressed the defendant's familial, educational,
social, physical, and mental health histories. 
At the sentencing hearing, the defendant called no witnesses, but
admitted six exhibits, including the defendant's DYS records and the results of
a psychological examination conducted during the defendants' commitment
pursuant to G. L. c. 123, § 18 (a).  Furthermore, the judge relied on the evidence
presented at trial on the topics covered in the presentence report as well as
expert testimony concerning the defendant's mental health.  See Perez II, 480 Mass. at 564 n.3
(discussing judge's ability to rely on trial evidence).  We view the trial judge's posttrial findings
of fact with "special deference." 
Id.  
      While "merely stating that [the
judge] considered the Miller factors, without more, would constitute a cursory
analysis that is incompatible with art. 26."  Deal v. Massachusetts Parole Bd., 484 Mass.
457, 462 (2020), there is no indication that the judge engaged in such a
cursory analysis here.  In addition to
traditional sentencing considerations, the judge considered the nature and
circumstances of the crimes; the defendant's age, family circumstances, and
mental health; the brain development of adolescents; and the possibility of
rehabilitation.  He observed that the
defendant "did not start life on third base"; his absentee father was
"abusive, harsh, unfaithful, and unpredictable," and his mother had
"mixed success" in providing emotional and financial support.  The crimes, however, did not reflect the
immaturity or impulsivity of youth.  The
defendant "carefully and deliberately prepared to kill his math
teacher."  
      Relying on the sentencing memorandum and
the judge's statements during the hearing, we conclude that the defendant was
afforded all the protections that a juvenile sentenced after Perez I would have
received.  Perez I, 477 Mass. at
686.  The defendant's allegations of
error concern the weight assigned to the Miller factors, a matter within the
judge's discretion.  See Lutskov, 480
Mass. at 582.  
      The proportionality requirements of art.
26 are meant to ensure that a defendant's punishment is not "so
disproportionate to the crime that it 'shocks the conscience.'"  Diatchenko, 466 Mass. at 669, quoting
Cepulonis, 384 Mass. at 497.  The
nonhomicide offenses were distinct heinous acts that inflicted, as the
Commonwealth argues, "suffering and humiliation in their own
right."  A forty-year prison
sentence does not shock the conscience.  
      l. 
Relief under G. L. c. 278, § 33E.  The defendant asks that we exercise our
extraordinary power pursuant to G. L. c. 278, § 33E, and either
order a new trial or reduce the murder verdict. 
After carefully reviewing the record, we conclude that none of the
asserted errors, standing alone or cumulatively, requires a new trial, and that
there is no other basis on which to disturb the jury's verdict.
Judgments
affirmed.

footnotes

[1] We
acknowledge the amicus briefs submitted in support of the defendant by the
youth advocacy division of the Committee for Public Counsel Services and the
Massachusetts Association of Criminal Defense Lawyers. 

[2] The jury
heard conflicting evidence regarding the defendant's reason for staying after
school.  According to a student, the
victim asked the defendant to stay after school because the defendant "was
struggling a little bit . . . and [the victim] wanted to help him."  The student added that the victim was
"really nice about it." 

[3] The facts
surrounding the victim's and defendant's appearances and movements throughout
the high school are based largely on video recordings from the school's
motion-activated network of more than one hundred surveillance cameras.  A video compilation of relevant clips, from
6:53 A.M. to 4:31 P.M., and still images from the video compilation were
introduced in evidence.  

[4] The defendant
is dark-skinned. 

[5] Based on this
evidence of perimortem injury (inflicted at around the time of death or during
the dying process), the defendant argued that the Commonwealth failed to
establish that the victim was alive at the time of this injury.  The jury found the defendant not guilty of
aggravated rape "to wit: 
penetrating genital opening with tree branch."  

[6] Anime is
"a style of animation originating in Japan that is characterized by stark
colorful graphics depicting vibrant characters in action-filled plots often
with fantastic or futuristic themes." 
Merriam-Webster Online Dictionary, https:
//www.merriam-webster.com/dictionary/anime
[https://perma.cc
/A3DG-8S8E].

[7] Among the
associated features supporting a diagnosis of schizophrenia, the DSM-V
notes:  "Currently, there are no
radiological, laboratory, or psychometric tests for the disorder.  Differences are evident in multiple brain
regions between groups of healthy individuals and persons with schizophrenia,
including evidence from neuroimaging, neuropathological, and neurophysiological
studies.  Differences are also evident in
cellular architecture, white matter connectivity, and gray matter volume in a
variety of regions such as the prefrontal and temporal cortices.  Reduced overall brain volume has been
observed, as well as increased brain volume reductions with age."  American Psychiatric Association, Diagnostic
and Statistical Manual of Mental Disorders 101-102 (5th ed. 2013).

[8] Manga are
"Japanese comic books and graphic novels considered collectively as a
genre."  Merriam-Webster Online
Dictionary, https://www.merriam-webster.com/dictionary/manga
[https://perma.cc/42K5-LS3A]. 

[9] We note that
the judge's decision predated Rodriguez, 484 Mass. 677.

[10] Further,
defense counsel argued to the jury that Dudley, utilizing his vast clinical
experience, observed the defendant's auditory command hallucinations and
delusional behavior.  

[11] "If the
notice of the defendant . . . indicate[s] that statements of the
defendant as to his or her mental condition will be relied upon by a
defendant's expert witness, . . . the defendant [may be ordered] to
submit to an examination."  Mass. R.
Crim. P. 14 (b) (2) (B).

[12] The
defendant does not dispute the Commonwealth's contention that the discovery
supplied to Kinscherff by defense counsel included the suppressed Danvers
police department videotaped statement.

[13] The
defendant contends also that the prosecutor misstated the evidence by arguing
that the defendant raped and robbed the victim in the bathroom.  Having found sufficient evidence to support
the Commonwealth's argument, see supra, the claim that the prosecutor misstated
the evidence is unavailing.  

[14] Defense
counsel had argued:  "[W]hen [the
defendant] followed [the victim] into that bathroom he was not himself, he was
not the kind, smart [fourteen year old] boy. 
He was totally and absolutely responding to the terrible command
hallucinations that were in his head."

[15] The court
conducted a competency evaluation of the defendant after the third day of
empanelment.  In opposition, the
prosecutor expressed her belief that the defendant was "feigning" to
delay trial, was "manipulating" the court, and was "concerned
that we are all going to be held hostage to his behavior for the next four to
six weeks."  The judge found the
defendant competent, and when empanelment resumed, the defense renewed its
motion for a change of venue or, in the alternative, dismissal of the
venire.  Defense counsel pointed to
widespread media coverage of the prosecutor's statements.  The judge denied the motion without
prejudice, indicating that "everything that's happened since impanelment
stopped is important" and that he would address any potential exposure to
this information in voir dire.  Relying
on press coverage of the competency hearing, the defendant argues on appeal
that the venire was likely influenced by the prosecutor's "inflammatory
comments."  The defendant, however,
has not brought to our attention a single instance where a potential juror
reported knowledge of the prosecutor's alleged inflammatory comments. 

[16] The
defendant further argues that the aggregate sentence with parole eligibility at
forty years constitutes the functional equivalent of life without the
possibility of parole in violation of art. 26. 
See Commonwealth v. Brown, 466 Mass. 676, 691 n.11 (2013), S.C., 474
Mass. 576 (2016).  While we decline to
draw a bright-line rule for what the functional equivalent of life without the
possibility of parole is in terms of years, we conclude that the defendant's
aggregate sentence allowing parole eligibility at age fifty-four does not reach
that threshold.  See Commonwealth v.
LaPlante, 482 Mass. 399, 406-407 (2019) (upholding forty-five year aggregate
sentence for juvenile convicted of three counts of murder in first degree).  See also Diatchenko, 471 Mass. at 29-30
("The art. 26 right of a juvenile homicide offender in relation to parole
is limited.  To repeat:  it is not a guarantee of eventual release,
but an entitlement to a meaningful opportunity for such release based on
demonstrated maturity and rehabilitation").